# MONTANA v. EGELHOFF

No. 95–566.   Argued March 20, 1996—Decided June 13, 1996

38

SCALIA, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and KENNEDY and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment, *post*, p. 56. O'CONNOR, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 61. SOUTER, J., filed a dissenting opinion, *post*, p. 73. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 79.

*Joseph P. Mazurek,* Attorney General of Montana, argued the cause for petitioner.   With him on the briefs were *Pamela P. Collins,* Assistant Attorney General, *Clay R. Smith,* and *Carter G. Phillips.*

*Miguel A. Estrada* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Dreeben,* and *Nina Goodman.*

*Ann C. German* argued the cause for respondent.   With her on the brief was *Amy N. Guth.**

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE THOMAS join.

We consider in this case whether the Due Process Clause is violated by Montana Code Annotated § 45–2–203, which provides, in relevant part, that voluntary intoxication "may

---

*Briefs of *amici curiae* urging reversal were filed for the State of Hawaii et al. by *Margery S. Bronster,* Attorney General of Hawaii, and *Steven S. Michaels,* Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Carla J. Stovall* of Kansas, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Thomas W. Corbett, Jr.,* of Pennsylvania, *Charles Molony Condon* of South Carolina, *Dan Morales* of Texas, *Darrell V. McGraw, Jr.,* of West Virginia, *Malaetasi Togafau* of American Samoa, and *Richard Weil* of the Northern Mariana Islands; for the American Alliance for Rights and Responsibilities et al. by *Philip Allen Lacovara* and *Robert Teir;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

*Diane Marie Amann* and *Barbara E. Bergman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense."

## I

In July 1992, while camping out in the Yaak region of northwestern Montana to pick mushrooms, respondent made friends with Roberta Pavola and John Christenson, who were doing the same. On Sunday, July 12, the three sold the mushrooms they had collected and spent the rest of the day and evening drinking, in bars and at a private party in Troy, Montana. Some time after 9 p.m., they left the party in Christenson's 1974 Ford Galaxy station wagon. The drinking binge apparently continued, as respondent was seen buying beer at 9:20 p.m. and recalled "sitting on a hill or a bank passing a bottle of Black Velvet back and forth" with Christenson. 272 Mont. 114, 118, 900 P. 2d 260, 262 (1995).

At about midnight that night, officers of the Lincoln County, Montana, sheriff's department, responding to reports of a possible drunk driver, discovered Christenson's station wagon stuck in a ditch along U. S. Highway 2. In the front seat were Pavola and Christenson, each dead from a single gunshot to the head. In the rear of the car lay respondent, alive and yelling obscenities. His blood-alcohol content measured .36 percent over one hour later. On the floor of the car, near the brake pedal, lay respondent's .38-caliber handgun, with four loaded rounds and two empty casings; respondent had gunshot residue on his hands.

Respondent was charged with two counts of deliberate homicide, a crime defined by Montana law as "purposely" or "knowingly" causing the death of another human being. Mont. Code Ann. § 45–5–102 (1995). A portion of the jury charge, uncontested here, instructed that "[a] person acts purposely when it is his conscious object to engage in conduct of that nature or to cause such a result," and that "[a] person acts knowingly when he is aware of his conduct or when he is aware under the circumstances his conduct consti-

tutes a crime; or, when he is aware there exists the high probability that his conduct will cause a specific result." App. to Pet. for Cert. 28a–29a. Respondent's defense at trial was that an unidentified fourth person must have committed the murders; his own extreme intoxication, he claimed, had rendered him physically incapable of committing the murders, and accounted for his inability to recall the events of the night of July 12. Although respondent was allowed to make this use of the evidence that he was intoxicated, the jury was instructed, pursuant to Mont. Code Ann. § 45–2–203 (1995), that it could not consider respondent's "intoxicated condition . . . in determining the existence of a mental state which is an element of the offense." App. to Pet. for Cert. 29a. The jury found respondent guilty on both counts, and the court sentenced him to 84 years' imprisonment.

The Supreme Court of Montana reversed. It reasoned (1) that respondent "had a due process right to present and have considered by the jury all relevant evidence to rebut the State's evidence on all elements of the offense charged," 272 Mont., at 125, 900 P. 2d, at 266, and (2) that evidence of respondent's voluntary intoxication was "clear[ly] . . . relevant to the issue of whether [respondent] acted knowingly and purposely," id., at 122, 900 P. 2d, at 265. Because § 45–2–203 prevented the jury from considering that evidence with regard to that issue, the court concluded that the State had been "relieved of part of its burden to prove beyond a reasonable doubt every fact necessary to constitute the crime charged," id., at 124, 900 P. 2d, at 266, and that respondent had therefore been denied due process. We granted certiorari. 516 U. S. 1021 (1995).

## II

The cornerstone of the Montana Supreme Court's judgment was the proposition that the Due Process Clause guarantees a defendant the right to present and have considered

by the jury *"all relevant evidence* to rebut the State's evidence on all elements of the offense charged." 272 Mont., at 125, 900 P. 2d, at 266 (emphasis added). Respondent does not defend this categorical rule; he acknowledges that the right to present relevant evidence "has not been viewed as absolute." Brief for Respondent 31. That is a wise concession, since the proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible. As we have said: "The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor* v. *Illinois,* 484 U. S. 400, 410 (1988). Relevant evidence may, for example, be excluded on account of a defendant's failure to comply with procedural requirements. See *Michigan* v. *Lucas,* 500 U. S. 145, 151 (1991). And any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence. For example, Federal (and Montana) Rule of Evidence 403 provides: *"Although relevant,* evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (Emphasis added.) Hearsay rules, see Fed. Rule Evid. 802, similarly prohibit the introduction of testimony which, though unquestionably relevant, is deemed insufficiently reliable.[1] Of course, to say that the right to intro-

---

[1] JUSTICE O'CONNOR agrees that "a defendant does not enjoy an absolute right to present evidence relevant to his defense," *post,* at 62, and does not dispute the validity of the evidentiary rules mentioned above. She contends, however, that Montana's Rule is not like these because it "places a blanket exclusion on a *category* of evidence that would allow the accused to negate the offense's mental-state element." *Ibid.* (emphasis added). Of course hearsay is a "category" of evidence as well; what JUSTICE O'CONNOR apparently has in mind is that this particular category relates to evidence tending to prove a particular fact. That is indeed a distinction, but it is hard to understand why it should make

duce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right. But it is to say that the defendant asserting such a limit must sustain the usual heavy burden that a due process claim entails:

> "[P]reventing and dealing with crime is much more the business of the States than it is of the Federal Government, and . . . we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally 'within the power of the State to regulate procedures under which its laws are carried out,' . . . and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Patterson* v. *New York*, 432 U. S. 197, 201–202 (1977) (citations omitted).

See also *Cooper* v. *Oklahoma*, 517 U. S. 348, 355 (1996) (applying *Patterson* test); *Marshall* v. *Lonberger*, 459 U. S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). Respondent's task, then, is to establish that a defendant's right to have a jury consider evidence of his voluntary intoxication in determining whether he possesses the requisite mental state is a "fundamental principle of justice."

Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice.

---

a difference. So long as the category of excluded evidence is selected on a basis that has good and traditional policy support, it ought to be valid.

We do not entirely understand JUSTICE O'CONNOR's argument that the vice of § 45-2-203 is that it excludes evidence "essential to the accused's defense," *post*, at 64; see also *post*, at 72. Evidence of intoxication is not always "essential," any more than hearsay evidence is always "nonessential."

See *Medina* v. *California*, 505 U. S. 437, 446 (1992). Here that gives respondent little support. By the laws of England, wrote Hale, the intoxicated defendant "shall have no privilege by this voluntary contracted madness, but shall have the same judgment as if he were in his right senses." 1 M. Hale, Pleas of the Crown *32–*33. According to Blackstone and Coke, the law's condemnation of those suffering from *dementia affectata* was harsher still: Blackstone, citing Coke, explained that the law viewed intoxication "as an aggravation of the offence, rather than as an excuse for any criminal misbehaviour." 4 W. Blackstone, Commentaries *25–*26. This stern rejection of inebriation as a defense became a fixture of early American law as well. The American editors of the 1847 edition of Hale wrote:

> "Drunkenness, it was said in an early case, can never be received as a ground to excuse or palliate an offence: this is not merely the opinion of a speculative philosopher, the argument of counsel, or the *obiter dictum* of a single judge, but it is a sound and long established maxim of judicial policy, from which perhaps a single dissenting voice cannot be found. But if no other authority could be adduced, the uniform decisions of our own Courts from the first establishment of the government, would constitute it now a part of the common law of the land." 1 Hale, *supra*, at *32, n. 3.

In an opinion citing the foregoing passages from Blackstone and Hale, Justice Story rejected an objection to the exclusion of evidence of intoxication as follows:

> "This is the first time, that I ever remember it to have been contended, that the commission of one crime was an excuse for another. Drunkenness is a gross vice, and in the contemplation of some of our laws is a crime; and I learned in my earlier studies, that so far from its being in law an excuse for murder, it is rather an aggravation

of its malignity." *United States* v. *Cornell*, 25 F. Cas. 650, 657–658 (No. 14,868) (CC R. I. 1820).

The historical record does not leave room for the view that the common law's rejection of intoxication as an "excuse" or "justification" for crime would nonetheless permit the defendant to show that intoxication prevented the requisite *mens rea*. Hale, Coke, and Blackstone were familiar, to say the least, with the concept of *mens rea*, and acknowledged that drunkenness "deprive[s] men of the use of reason," 1 Hale, *supra*, at *32; see also Blackstone, *supra*, at *25. It is inconceivable that they did not realize that an offender's drunkenness might impair his ability to form the requisite intent; and inconceivable that their failure to note this massive exception from the general rule of disregard of intoxication was an oversight. Hale's statement that a drunken offender shall have the same judgment "as if he were in his right senses" must be understood as precluding a defendant from arguing that, because of his intoxication, he could not have possessed the *mens rea* required to commit the crime. And the same must be said of the exemplar of the common-law rule cited by both Hale and Blackstone, see 1 Hale, *supra*, at *32; Blackstone, *supra*, at *26, n. *w*, which is Serjeant Pollard's argument to the King's Bench in *Reniger* v. *Fogossa*, 1 Plowd. 1, 19, 75 Eng. Rep. 1, 31 (1550): "[I]f a person that is drunk kills another, this shall be Felony, and he shall be hanged for it, and yet he did it through Ignorance, for when he was drunk he had *no Understanding* nor Memory; but inasmuch as that Ignorance was occasioned by his own Act and Folly, and he might have avoided it, he shall not be privileged thereby." (Emphasis added.) See also *Beverley's Case*, 4 Co. Rep. 123b, 125a, 76 Eng. Rep. 1118, 1123 (K. B. 1603) ("although he who is drunk, is for the time *non compos mentis*, yet his drunkenness does not extenuate his act or offence, *nor turn to his avail*" (emphasis added) (footnote omitted)).

Against this extensive evidence of a lengthy common-law tradition decidedly against him, the best argument available to respondent is the one made by his *amicus* and conceded by the State: Over the course of the 19th century, courts carved out an exception to the common law's traditional across-the-board condemnation of the drunken offender, allowing a jury to consider a defendant's intoxication when assessing whether he possessed the mental state needed to commit the crime charged, where the crime was one requiring a "specific intent." The emergence of this new rule is often traced to an 1819 English case, in which Justice Holroyd is reported to have held that "though voluntary drunkenness cannot excuse from the commission of crime, yet where, as on a charge of murder, the material question is, whether an act was premeditated or done only with sudden heat and impulse, the fact of the party being intoxicated [is] a circumstance proper to be taken into consideration." 1 W. Russell, Crimes and Misdemeanors *8 (citing *King* v. *Grindley*, Worcester Sum. Assizes 1819, MS). This exception was "slow to take root," however, Hall, Intoxication and Criminal Responsibility, 57 Harv. L. Rev. 1045, 1049 (1944), even in England. Indeed, in the 1835 case of *King* v. *Carroll*, 7 Car. & P. 145, 147, 173 Eng. Rep. 64, 65 (N. P.), Justice Park claimed that Holroyd had "retracted his opinion" in *Grindley*, and said "there is no doubt that that case is not law." In this country, as late as 1858 the Missouri Supreme Court could speak as categorically as this:

> "To look for deliberation and forethought in a man maddened by intoxication is vain, for drunkenness has deprived him of the deliberating faculties to a greater or less extent; and if this deprivation is to relieve him of all responsibility or to diminish it, the great majority of crimes committed will go unpunished. This however is not the doctrine of the common law; and to its maxims, based as they obviously are upon true wisdom and sound

policy, we must adhere." *State* v. *Cross*, 27 Mo. 332, 338 (1858).

And as late as 1878, the Vermont Supreme Court upheld the giving of the following instruction at a murder trial:

> " 'The voluntary intoxication of one who without provocation commits a homicide, although amounting to a frenzy, that is, although the intoxication amounts to a frenzy, does not excuse him from the same construction of his conduct, and the same legal inferences upon the question of premeditation and intent, as affecting the grade of his crime, which are applicable to a person entirely sober.' " *State* v. *Tatro*, 50 Vt. 483, 487 (1878).

See also *Harris* v. *United States*, 8 App. D. C. 20, 26–30 (1896); *Flanigan* v. *People*, 86 N. Y. 554, 559–560 (1881); *Commonwealth* v. *Hawkins*, 69 Mass. 463, 466 (1855); *State* v. *McCants*, 1 Spears 384, 391–395 (S. C. 1842). Eventually, however, the new view won out, and by the end of the 19th century, in most American jurisdictions, intoxication could be considered in determining whether a defendant was capable of forming the specific intent necessary to commit the crime charged. See Hall, *supra*, at 1049; *Hopt* v. *People*, 104 U. S. 631, 633–634 (1882) (citing cases).

On the basis of this historical record, respondent's *amicus* argues that "[t]he old common-law rule . . . was no longer deeply rooted at the time the Fourteenth Amendment was ratified." Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 23. That conclusion is questionable, but we need not pursue the point, since the argument of *amicus* mistakes the nature of our inquiry. It is not the State which bears the burden of demonstrating that its rule is "deeply rooted," but rather respondent who must show that the principle of procedure *violated* by the rule (and allegedly required by due process) is " 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Patterson* v. *New York*, 432 U. S., at 202.

Thus, even assuming that when the Fourteenth Amendment was adopted the rule Montana now defends was no longer generally applied, this only cuts off what might be called an *a fortiori* argument in favor of the State. The burden remains upon respondent to show that the "new common-law" rule—that intoxication may be considered on the question of intent—was so deeply rooted at the time of the Fourteenth Amendment (or perhaps has become so deeply rooted since) as to be a fundamental principle which that Amendment enshrined.

That showing has not been made. Instead of the uniform and continuing acceptance we would expect for a rule that enjoys "fundamental principle" status, we find that fully one-fifth of the States either never adopted the "new common-law" rule at issue here or have recently abandoned it.[2] Cf. *Cooper* v. *Oklahoma*, 517 U. S. 348 (1996) (finding due process violation in a rule having no common-law pedigree whatever, and adopted, very recently, by only four States). See also *Martin* v. *Ohio*, 480 U. S. 228, 236 (1987)

---

[2] Besides Montana, those States are Arizona, see *State* v. *Ramos*, 133 Ariz. 4, 6, 648 P. 2d 119, 121 (1982) (upholding statute precluding jury consideration of intoxication for purposes of determining whether defendant acted "knowingly"); Ariz. Rev. Stat. Ann. § 13–503 (Supp. 1995–1996) (voluntary intoxication "is not a defense for any criminal act or requisite state of mind"); Arkansas, see *White* v. *State*, 290 Ark. 130, 134–137, 717 S. W. 2d 784, 786–788 (1986) (interpreting Ark. Code Ann. § 5–2–207 (1993)); Delaware, see *Wyant* v. *State*, 519 A. 2d 649, 651 (1986) (interpreting Del. Code Ann., Tit. 11, § 421 (1995)); Georgia, see *Foster* v. *State*, 258 Ga. 736, 742–745, 374 S. E. 2d 188, 194–196 (1988) (interpreting Ga. Code Ann. § 16–3–4 (1992)), cert. denied, 490 U. S. 1085 (1989); Hawaii, see Haw. Rev. Stat. § 702–230(2) (1993), *State* v. *Souza*, 72 Haw. 246, 248, 813 P. 2d 1384, 1386 (1991) (§ 702–230(2) is constitutional); Mississippi, see *Lanier* v. *State*, 533 So. 2d 473, 478–479 (1988); Missouri, see Mo. Rev. Stat. § 562.076 (1994), *State* v. *Erwin*, 848 S. W. 2d 476, 482 (§ 562.076 is constitutional), cert. denied, 510 U. S. 826 (1993); South Carolina, see *State* v. *Vaughn*, 268 S. C. 119, 124–126, 232 S. E. 2d 328, 330–331 (1977); and Texas, see *Hawkins* v. *State*, 605 S. W. 2d 586, 589 (Tex. Crim. App. 1980) (interpreting Tex. Penal Code Ann. § 8.04 (1974)).

("We are aware that all but two of the States . . . have abandoned the common-law rule . . . . But the question remains whether those [two] States are in violation of the Constitution").

It is not surprising that many States have held fast to or resurrected the common-law rule prohibiting consideration of voluntary intoxication in the determination of *mens rea*, because that rule has considerable justification[3]—which alone casts doubt upon the proposition that the opposite rule is a "fundamental principle." A large number of crimes, especially violent crimes, are committed by intoxicated offenders; modern studies put the numbers as high as half of all homicides, for example. See, *e. g.*, Third Special Report to the U. S. Congress on Alcohol and Health from the Secretary of Health, Education, and Welfare 64 (1978); Note, Alcohol Abuse and the Law, 94 Harv. L. Rev. 1660, 1681–1682 (1981). Disallowing consideration of voluntary intoxication has the

---

[3] In his dissent, JUSTICE SOUTER acknowledges that there *may be* valid policy reasons supporting the Montana law, some of which were brought forward by States that appeared as *amici*, see *post*, at 77–78 (citing Brief for State of Hawaii et al. as *Amici Curiae* 16). He refuses to consider the adequacy of those reasons, however, because they were not brought forward *by Montana's lawyers.* We do not know why the constitutionality of Montana's enactment should be subject to the condition subsequent that its lawyers be able to guess a policy justification that satisfies this Court. Whatever they guess will of course not necessarily be the *real reason* the Montana Legislature adopted the provision; Montana's lawyers must speculate about that, just as we must. Our standard formulation has been: "Where . . . there are plausible reasons for [the legislature's] action, our inquiry is at an end." *Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 179 (1980). JUSTICE SOUTER would change that to: "Where there are plausible reasons that counsel for the party supporting the legislation have mentioned." Or perhaps it is: "Where there are plausible reasons that counsel for the Government (or State) have mentioned"—so that in this case Hawaii's *amicus* brief would count if a Hawaiian statute were at issue. Either way, it is strange for the constitutionality of a state law to depend upon whether the lawyers hired by the State (or elected by its people) to defend the law happen to hit the right boxes on our bingo card of acceptable policy justifications.

effect of increasing the punishment for all unlawful acts committed in that state, and thereby deters drunkenness or irresponsible behavior while drunk. The rule also serves as a specific deterrent, ensuring that those who prove incapable of controlling violent impulses while voluntarily intoxicated go to prison. And finally, the rule comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences. See, e. g., *McDaniel* v. *State,* 356 So. 2d 1151, 1160–1161 (Miss. 1978).[4]

There is, in modern times, even more justification for laws such as § 45–2–203 than there used to be. Some recent studies suggest that the connection between drunkenness and crime is as much cultural as pharmacological—that is, that drunks are violent not simply because alcohol makes them that way, but because they are behaving in accord with their learned belief that drunks are violent. See, e. g., Collins, Suggested Explanatory Frameworks to Clarify the Alcohol Use/Violence Relationship, 15 Contemp. Drug Prob. 107, 115 (1988); Critchlow, The Powers of John Barleycorn, 41 Am. Psychologist 751, 754–755 (July 1986). This not only adds additional support to the traditional view that an intoxicated criminal is not deserving of exoneration, but it suggests that juries—who possess the same learned belief as the intoxicated offender—will be too quick to accept the claim that the defendant was biologically incapable of forming the requisite

---

[4] As appears from this analysis, we are in complete agreement with the concurrence that § 45–2–203 "embodies a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions," *post,* at 57. We also agree that the statute "'extract[s] the entire subject of voluntary intoxication from the mens rea inquiry,'" *post,* at 58. We believe that this judgment may be implemented, and this effect achieved, with equal legitimacy by amending the substantive requirements for each crime, or by simply excluding intoxication evidence from the trial. We address this as an evidentiary statute simply because that is how the Supreme Court of Montana chose to analyze it.

*mens rea.* Treating the matter as one of excluding misleading evidence therefore makes some sense.[5]

In sum, not every widespread experiment with a procedural rule favorable to criminal defendants establishes a fundamental principle of justice. Although the rule allowing a jury to consider evidence of a defendant's voluntary intoxication where relevant to *mens rea* has gained considerable acceptance, it is of too recent vintage, and has not received sufficiently uniform and permanent allegiance, to qualify as fundamental, especially since it displaces a lengthy common-law tradition which remains supported by valid justifications today.[6]

### III

The Supreme Court of Montana's conclusion that Mont. Code Ann. § 45–2–203 (1995) violates the Due Process Clause purported to rest on two lines of our jurisprudence. First,

---

[5] These many valid policy reasons for excluding evidence of voluntary intoxication refute JUSTICE O'CONNOR's claim that § 45–2–203 has no purpose other than to improve the State's likelihood of winning a conviction, see *post*, at 66–67, 72–73. Such a claim is no more accurate as applied to this provision than it would have been as applied to the New York law in *Patterson* v. *New York*, 432 U. S. 197 (1977), which placed upon the defendant the burden of proving the affirmative defense of extreme emotional disturbance. We upheld that New York law, even though we found it "very likely true that fewer convictions of murder would occur if New York were required to negative the affirmative defense at issue here." *Id.*, at 209. Here, as in *Patterson*, any increase in the chance of obtaining a conviction is merely a consequence of pursuing legitimate penological goals.

[6] JUSTICE O'CONNOR maintains that "to determine whether a fundamental principle of justice has been violated here, we cannot consider only the historical disallowance of intoxication evidence, but must also consider the 'fundamental principle' that a defendant has a right to a fair opportunity to put forward his defense." *Post*, at 71. What JUSTICE O'CONNOR overlooks, however, is that the historical disallowance of intoxication evidence sheds light upon what our society has understood by a "fair opportunity to put forward [a] defense." That "fundamental principle" has demonstrably not included the right to introduce intoxication evidence.

it derived its view that the Due Process Clause requires the admission of all relevant evidence from the statement in *Chambers* v. *Mississippi*, 410 U. S. 284, 294 (1973), that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Respondent relies heavily on this statement, which he terms "the *Chambers* principle," Brief for Respondent 30.

We held in *Chambers* that "the exclusion of [certain] critical evidence, coupled with the State's refusal to permit [petitioner] to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." 410 U. S., at 302. We continued, however:

> "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that *under the facts and circumstances of this case* the rulings of the trial court deprived Chambers of a fair trial." *Id.*, at 302–303 (emphasis added).

In other words, *Chambers* was an exercise in highly case-specific error correction. At issue were two rulings by the state trial court at Chambers' murder trial: denial of Chambers' motion to treat as an adverse witness one McDonald, who had confessed to the murder for which Chambers was on trial, but later retracted the confession; and exclusion, on hearsay grounds, of testimony of three witnesses who would testify that McDonald had confessed to them. We held that both of these rulings were erroneous, the former because McDonald's testimony simply *was* adverse, *id.*, at 297–298, and the second because the statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *id.*,

at 300, and were "well within the basic rationale of the exception for declarations against interest," *id.*, at 302. Thus, the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

Respondent cites our decision in *Crane* v. *Kentucky*, 476 U. S. 683 (1986), as evidence that his version of the *"Chambers* principle" governs our jurisprudence. He highlights statements in *Crane* to the effect that "an essential component of procedural fairness is an opportunity to be heard," which would effectively be denied "if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.*, at 690; Brief for Respondent 31. But the very next sentence of that opinion (which respondent omits) makes perfectly clear that we were *not* setting forth an absolute entitlement to introduce crucial, relevant evidence: *"In the absence of any valid state justification,* exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." 476 U. S., at 690–691 (emphasis added) (internal quotation marks omitted). Our holding that the exclusion of certain evidence in that case violated the defendant's constitutional rights rested not on a theory that all "competent, reliable evidence" must be admitted, but rather on the ground that the Supreme Court of Kentucky's sole rationale for the exclusion (that the evidence "did not relate to the credibility of the confession," *Crane* v. *Commonwealth*, 690 S. W. 2d 753, 755 (1985)) was wrong. See 476 U. S., at 687. *Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a "valid" reason, as it has been by Montana.

The second line of our cases invoked by the Montana Supreme Court's opinion requires even less discussion. *In re Winship*, 397 U. S. 358, 364 (1970), announced the proposition that the Due Process Clause requires proof beyond a reasonable doubt of every fact necessary to constitute the charged crime, and *Sandstrom* v. *Montana*, 442 U. S. 510, 524 (1979), established a corollary, that a jury instruction which shifts to the defendant the burden of proof on a requisite element of mental state violates due process. These decisions simply are not implicated here because, as the Montana court itself recognized, "[t]he burden is not shifted" under § 45–2–203. 272 Mont., at 124, 900 P. 2d, at 266. The trial judge instructed the jury that "[t]he State of Montana has the burden of proving the guilt of the Defendant beyond a reasonable doubt," App. to Pet. for Cert. 27a, and that "[a] person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being," *id.,* at 28a. Thus, failure by the State to produce evidence of respondent's mental state would have resulted in an acquittal. That acquittal did not occur was presumably attributable to the fact, noted by the Supreme Court of Montana, that the State introduced considerable evidence from which the jury might have concluded that respondent acted "purposely" or "knowingly." See 272 Mont., at 122, 900 P. 2d, at 265. For example, respondent himself testified that, several hours before the murders, he had given his handgun to Pavola and asked her to put it in the glove compartment of Christenson's car. *Ibid.;* 5 Tr. 1123. That he had to retrieve the gun from the glove compartment before he used it was strong evidence that it was his "conscious object" to commit the charged crimes; as was the execution-style manner in which a single shot was fired into the head of each victim.

Recognizing that *Sandstrom* is not directly on point, the Supreme Court of Montana described § 45–2–203 as a burden-*reducing,* rather than burden-shifting, statute. 272

Mont., at 122–123, 124, 900 P. 2d, at 265, 266. This obviously was not meant to suggest that the statute formally reduced the burden of proof to clear and convincing, or to a mere preponderance; there is utterly no basis for that, neither in the text of the law nor in the jury instruction that was given. What the court evidently meant is that, by excluding a significant line of evidence that might refute *mens rea*, the statute made it easier for the State to meet the requirement of proving *mens rea* beyond a reasonable doubt—reduced the burden in the sense of making the burden easier to bear. But *any* evidentiary rule can have that effect. "Reducing" the State's burden in this manner is not unconstitutional, unless the rule of evidence itself violates a fundamental principle of fairness (which, as discussed, this one does not). We have "reject[ed] the view that anything in the Due Process Clause bars States from making changes in their criminal law that have the effect of making it easier for the prosecution to obtain convictions." *McMillan* v. *Pennsylvania,* 477 U. S. 79, 89, n. 5 (1986).

Finally, we may comment upon the Montana Supreme Court's citation of the following passage in *Martin* v. *Ohio,* 480 U. S. 228 (1987), a case upholding a state law that placed on the defendant the burden of proving self-defense by a preponderance of the evidence:

> "It would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case, *i. e.,* that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard. Such an instruction would relieve the State of its burden and plainly run afoul of *[In re] Winship*'s mandate. The instructions in this case . . . are adequate to convey to the jury that all of the evidence, including the evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the

State's proof of the elements of the crime." *Id.*, at 233–234 (citation omitted).

See also 272 Mont., at 122–123, 900 P. 2d, at 265. This passage can be explained in various ways—*e. g.*, as an assertion that the right to have a jury consider self-defense evidence (unlike the right to have a jury consider evidence of voluntary intoxication) is fundamental, a proposition that the historical record may support. But the only explanation needed for present purposes is the one given in *Kokkonen* v. *Guardian Life Ins. Co.*, 511 U. S. 375, 379 (1994): "It is to the holdings of our cases, rather than their dicta, that we must attend." If the *Martin* dictum means that the Due Process Clause requires all relevant evidence bearing on the elements of a crime to be admissible, the decisions we have discussed show it to be incorrect.

\* \* \*

"The doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States." *Powell* v. *Texas*, 392 U. S. 514, 535–536 (1968) (plurality opinion). The people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so, and the judgment of the Supreme Court of Montana to the contrary must be reversed.

*It is so ordered.*

JUSTICE GINSBURG, concurring in the judgment.

The Court divides in this case on a question of characterization. The State's law, Mont. Code Ann. § 45–2–203 (1995),

prescribes that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense." For measurement against federal restraints on state action, how should we type that prescription? If § 45–2–203 is simply a rule designed to keep out "relevant, exculpatory evidence," JUSTICE O'CONNOR maintains, *post*, at 67, Montana's law offends due process. If it is, instead, a redefinition of the mental-state element of the offense, on the other hand, JUSTICE O'CONNOR's due process concern "would not be at issue," *post*, at 71, for "[a] state legislature certainly has the authority to identify the elements of the offenses it wishes to punish," *post*, at 64, and to exclude evidence irrelevant to the crime it has defined.

Beneath the labels (rule excluding evidence or redefinition of the offense) lies the essential question: Can a State, without offense to the Federal Constitution, make the judgment that two people are equally culpable where one commits an act stone sober, and the other engages in the same conduct after his voluntary intoxication has reduced his capacity for self-control? For the reasons that follow, I resist categorizing § 45–2–203 as merely an evidentiary prescription, but join the Court's judgment refusing to condemn the Montana statute as an unconstitutional enactment.

Section 45–2–203 does not appear in the portion of Montana's Code containing evidentiary rules (Title 26), the expected placement of a provision regulating solely the admissibility of evidence at trial. Instead, Montana's intoxication statute appears in Title 45 ("Crimes"), as part of a chapter entitled "General Principles of Liability." Mont. Code Ann., Tit. 45, ch. 2 (1995). No less than adjacent provisions governing duress and entrapment, § 45–2–203 embodies a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions.

As urged by Montana and its *amici*, § 45–2–203 "extract[s] the entire subject of voluntary intoxication from the mens rea inquiry," Reply Brief for Petitioner 2, thereby rendering evidence of voluntary intoxication logically irrelevant to proof of the requisite mental state. Thus, in a prosecution for deliberate homicide, the State need not prove that the defendant "purposely or knowingly cause[d] the death of another," Mont. Code Ann. § 45–5–102(a) (1995), in a purely subjective sense. To obtain a conviction, the prosecution must prove only that (1) the defendant caused the death of another with actual knowledge or purpose, *or* (2) that the defendant killed "under circumstances that would otherwise establish knowledge or purpose 'but for' [the defendant's] voluntary intoxication." Brief for American Alliance for Rights and Responsibilities et al. as *Amici Curiae* 6. See also Brief for Petitioner 35–36; Brief for United States as *Amicus Curiae* 10–12. Accordingly, § 45–2–203 does not "lighte[n] the prosecution's burden to prove [the] mental-state element beyond a reasonable doubt," as JUSTICE O'CONNOR suggests, *post*, at 64, for "[t]he applicability of the reasonable-doubt standard . . . has always been dependent on how a State defines the offense that is charged," *Patterson* v. *New York*, 432 U. S. 197, 211, n. 12 (1977).

Comprehended as a measure redefining *mens rea*, § 45–2–203 encounters no constitutional shoal. States enjoy wide latitude in defining the elements of criminal offenses, see, *e. g.*, *Martin* v. *Ohio*, 480 U. S. 228, 232 (1987); *Patterson*, 432 U. S., at 201–202, particularly when determining "the extent to which moral culpability should be a prerequisite to conviction of a crime," *Powell* v. *Texas*, 392 U. S. 514, 545 (1968) (Black, J., concurring). When a State's power to define criminal conduct is challenged under the Due Process Clause, we inquire only whether the law "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Patterson*, 432 U. S., at 202 (internal quotation marks omitted). Defining *mens*

*rea* to eliminate the exculpatory value of voluntary intoxication does not offend a "fundamental principle of justice," given the lengthy common-law tradition, and the adherence of a significant minority of the States to that position today. See *ante*, at 43–49; see also *post*, at 73 (SOUTER, J., dissenting) ("[A] State may so define the mental element of an offense that evidence of a defendant's voluntary intoxication at the time of commission does not have exculpatory relevance and, to that extent, may be excluded without raising any issue of due process.").

Other state courts have upheld statutes similar to § 45–2–203, not simply as evidentiary rules, but as legislative redefinitions of the mental-state element. See *State* v. *Souza*, 72 Haw. 246, 249, 813 P. 2d 1384, 1386 (1991) ("legislature was entitled to redefine the mens rea element of crimes and to exclude evidence of voluntary intoxication to negate state of mind"); *State* v. *Ramos*, 133 Ariz. 4, 6, 648 P. 2d 119, 121 (1982) ("Perhaps the state of mind which needs to be proven here is a watered down *mens rea;* however, this is the prerogative of the legislature."); *Commonwealth* v. *Rumsey*, 309 Pa. Super. 137, 139, 454 A. 2d 1121, 1122 (1983) (quoting *Powell*, 392 U. S., at 536 (plurality opinion)) ("Redefinition of the kind and quality of mental activity that constitutes the *mens rea* element of crimes is a permissible part of the legislature's role in the 'constantly shifting adjustment between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man.'"). Legislation of this order, if constitutional in Arizona, Hawaii, and Pennsylvania, ought not be declared unconstitutional by this Court when enacted in Montana.

If, as the plurality, JUSTICE O'CONNOR, and JUSTICE SOUTER agree, it is within the legislature's province to instruct courts to treat a sober person and a voluntarily intoxicated person as equally responsible for conduct—to place a voluntarily intoxicated person on a level with a sober person—then the Montana law is no less tenable under the Federal

Constitution than are the laws, with no significant difference in wording, upheld in sister States.[1] The Montana Supreme Court did not disagree with the courts of other States; it simply did not undertake an analysis in line with the principle that legislative enactments plainly capable of a constitutional construction ordinarily should be given that construction. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988); *State* v. *Lilburn,* 265 Mont. 258, 266, 875 P. 2d 1036, 1041 (1994).

The Montana Supreme Court's judgment, in sum, strikes down a statute whose text displays no constitutional infirmity. If the Montana court considered its analysis forced by this Court's precedent,[2] it is proper for this Court to say

---

[1] JUSTICE BREYER questions the States' authority to treat voluntarily intoxicated and sober defendants as equally culpable for their actions. See *post,* at 80. He asks, moreover, *post,* at 79–80, why a legislature concerned with the high incidence of crime committed by individuals in an alcohol-impaired condition would choose the course Montana and several other States have taken. It would be more sensible, he suggests, to "equate voluntary intoxication [with] knowledge, and purpose," *post,* at 80, thus dispensing entirely with the *mens rea* requirement when individuals act under the influence of a judgment-impairing substance. It does not seem to me strange, however, that States have resisted such a catchall approach and have enacted, instead, a measure less sweeping, one that retains a *mens rea* requirement, but "define[s] culpable mental state so as to give voluntary intoxication no exculpatory relevance." See *post,* at 75 (SOUTER, J., dissenting). Nor is it at all clear to me that "a jury unaware of intoxication would likely infer knowledge or purpose" in the example JUSTICE BREYER provides, *post,* at 79. It is not only in fiction, see J. Thurber, The Secret Life of Walter Mitty (1983) (originally published in *The New Yorker* in 1939), but, sadly, in real life as well, that sober people drive while daydreaming or otherwise failing to pay attention to the road.

[2] The United States, as *amicus curiae,* so suggested at oral argument. See Tr. of Oral Arg. 20 ("[T]he State court never really got to the question of whether there has been a [substantive] change in the State law, because it [assumed] that, to the extent that there had been one, it was barred by [*In re Winship,* 397 U. S. 358 (1970)].").

what prescriptions federal law leaves to the States,[3] and thereby dispel confusion to which we may have contributed, and attendant state-court misperception.

JUSTICE O'CONNOR, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

The Montana Supreme Court unanimously held that Mont. Code Ann. § 45–2–203 (1995) violates due process. I agree. Our cases establish that due process sets an outer limit on the restrictions that may be placed on a defendant's ability to raise an effective defense to the State's accusations. Here, to impede the defendant's ability to throw doubt on the State's case, Montana has removed from the jury's consideration a category of evidence relevant to determination of mental state where that mental state is an essential element of the offense that must be proved beyond a reasonable doubt. Because this disallowance eliminates evidence with which the defense might negate an essential element, the State's burden to prove its case is made correspondingly easier. The justification for this disallowance is the State's desire to increase the likelihood of conviction of a certain class of defendants who might otherwise be able to prove that they did not satisfy a requisite element of the offense. In my view, the statute's effect on the criminal proceeding violates due process.

I

This Court's cases establish that limitations placed on the accused's ability to present a fair and complete defense can, in some circumstances, be severe enough to violate due process. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers* v. *Mississippi*, 410 U. S. 284, 294 (1973). Applying our precedent, the Mon-

---

[3] As the United States observed, it is generally within the States' domain "to determine what are the elements of criminal responsibility." *Id.*, at 19–20.

tana Supreme Court held that keeping intoxication evidence away from the jury, where such evidence was relevant to establishment of the requisite mental state, violated the due process right to present a defense, 272 Mont. 114, 123, 900 P. 2d 260, 265 (1995), and that the instruction pursuant to § 45–2–203 was not harmless error, *id.*, at 124, 900 P. 2d, at 266. In rejecting the Montana Supreme Court's conclusion, the plurality emphasizes that "any number of familiar and unquestionably constitutional evidentiary rules" permit exclusion of relevant evidence. *Ante*, at 42. It is true that a defendant does not enjoy an absolute right to present evidence relevant to his defense. See *Crane* v. *Kentucky,* 476 U. S. 683, 690–691 (1986). But none of the "familiar" evidentiary rules operates as Montana's does. The Montana statute places a blanket exclusion on a category of evidence that would allow the accused to negate the offense's mental-state element. In so doing, it frees the prosecution, in the face of such evidence, from having to prove beyond a reasonable doubt that the defendant nevertheless possessed the required mental state. In my view, this combination of effects violates due process.

The proposition that due process requires a fair opportunity to present a defense in a criminal prosecution is not new. See *id.*, at 690; *California* v. *Trombetta,* 467 U. S. 479, 485 (1984). In *Chambers,* the defendant had been prevented from cross-examining a witness and from presenting witnesses on his own behalf by operation of Mississippi's "voucher" and hearsay rules. The Court held that the application of these evidentiary rules deprived the defendant of a fair trial. "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U. S., at 302. The plurality's characterization of *Chambers* as "case-specific error correction," *ante*, at 52, cannot diminish its force as a prohibition on enforcement of state evidentiary rules that lead, without sufficient justification, to

the establishment of guilt by suppression of evidence supporting the defendant's case.

In *Crane*, a trial court had held that the defendant could not introduce testimony bearing on the circumstances of his confession, on the grounds that this information bore only on the "voluntariness" of the confession, a matter already resolved. We held that by keeping such critical information from the jury this exclusion "deprived petitioner of his fundamental constitutional right to a fair opportunity to present a defense." 476 U. S., at 687. The Court emphasized that, while States have the power to exclude evidence through evidentiary rules that serve the interests of fairness and reliability, limitations on evidence may exceed the bounds of due process where such limitations undermine a defendant's ability to present exculpatory evidence without serving a valid state justification.

In *Washington* v. *Texas*, 388 U. S. 14 (1967), the trial court refused to permit a defense witness to testify on the basis of Texas statutes providing that persons charged or convicted as coparticipants in the same crime could not testify for one another, although they could testify for the State. The Court held that the Constitution prohibited a State from establishing rules to prevent whole categories of defense witnesses from testifying out of a belief that such witnesses were untrustworthy. Such action by the State detracted too severely and arbitrarily from the defendant's right to call witnesses in his favor.

These cases, taken together, illuminate a simple principle: Due process demands that a criminal defendant be afforded a fair opportunity to defend against the State's accusations. Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence. To be sure, the right to present evidence is not limitless; for example, it does not permit the defendant to introduce any and all evidence he believes

might work in his favor, *Crane, supra,* at 690, nor does it generally invalidate the operation of testimonial privileges, *Washington* v. *Texas, supra,* at 23, n. 21. Nevertheless, "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence" that is essential to the accused's defense. *Crane, supra,* at 690 (citations omitted). Section 45–2–203 forestalls the defendant's ability to raise an effective defense by placing a blanket exclusion on the presentation of a type of evidence that directly negates an element of the crime, and by doing so, it lightens the prosecution's burden to prove that mental-state element beyond a reasonable doubt.

This latter effect is as important to the due process analysis as the former. A state legislature certainly has the authority to identify the elements of the offenses it wishes to punish, but once its laws are written, a defendant has the right to insist that the State prove beyond a reasonable doubt every element of an offense charged. See *McMillan* v. *Pennsylvania,* 477 U. S. 79, 85 (1986); *Patterson* v. *New York,* 432 U. S. 197, 211, n. 12 (1977) ("The applicability of the reasonable-doubt standard, however, has always been dependent on how a State defines the offense that is charged"). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U. S. 358, 364 (1970); *Patterson, supra,* at 210. Because the Montana Legislature has specified that a person commits "deliberate homicide" only if he "purposely or knowingly causes the death of another human being," Mont. Code Ann. § 45–5–102(1)(a) (1995), the prosecution must prove the existence of such mental state in order to convict. That is, unless the defendant is shown to have acted purposely or knowingly, *he is not guilty of the offense of deliberate homicide.* The Montana Supreme Court found that it was inconsistent with the legislature's

requirement of the mental state of "purposely" or "knowingly" to prevent the jury from considering evidence of voluntary intoxication, where that category of evidence was relevant to establishment of that mental-state element. 272 Mont., at 122–123, 900 P. 2d, at 265–266.

Where the defendant may introduce evidence to negate a subjective mental-state element, the prosecution must work to overcome whatever doubts the defense has raised about the existence of the required mental state. On the other hand, if the defendant may *not* introduce evidence that might create doubt in the factfinder's mind as to whether that element was met, the prosecution will find its job so much the easier. A subjective mental state is generally proved only circumstantially. If a jury may not consider the defendant's evidence of his mental state, the jury may impute to the defendant the culpability of a mental state he did not possess.

In *Martin* v. *Ohio*, 480 U. S. 228 (1987), the Court considered an Ohio statute providing that a defendant bore the burden of proving, by a preponderance of the evidence, an affirmative defense such as self-defense. We held that placing that burden on the defendant did not violate due process. The Court noted in explanation that it would nevertheless have been error to instruct the jury that "self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case" where Ohio's definition of the intent element made self-defense evidence relevant to the State's burden. *Id.*, at 233–234. "Such an instruction would relieve the State of its burden and plainly run afoul of *Winship*'s mandate." *Id.*, at 234. In other words, the State's right to shift the burden of proving an affirmative defense did not include the power to prevent the defendant from attempting to prove self-defense in an effort to cast doubt on the State's case. Dictum or not, this observation explained our reasoning and is similarly applicable here, where the State has benefited from the defendant's in-

ability to make an argument which, if accepted, could throw reasonable doubt on the State's proof. The placement of the burden of proof for affirmative defenses should not be confused with the use of evidence to negate elements of the offense charged.

*Crane* noted: "In the absence of any valid state justification, exclusion of this kind of exculpatory evidence [circumstances of confession] deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." 476 U. S., at 690–691 (internal quotation marks omitted). The State here had substantial proof of the defendant's knowledge or purpose in committing these homicides, and might well have prevailed even had the jury been permitted to consider the defendant's intoxication. But as in *Crane*, the prosecution's case has been insulated from meaningful adversarial testing by the scale-tipping removal of the necessity to face a critical category of defense evidence.

The plurality ignores *Crane*'s caution that the prosecution must be put to a full test. Rather, it invokes *Crane* to emphasize that "introduction of relevant evidence can be limited by the State for a 'valid' reason, as it has been by Montana." *Ante*, at 53. The State's brief to this Court enunciates a single reason: Due to the well-known risks related to voluntary intoxication, it seeks to prevent a defendant's use of his own voluntary intoxication as basis for exculpation. Brief for Petitioner 12, 17–19. That is, its interest is to ensure that even a defendant who lacked the required mental-state element—and is therefore not guilty—is nevertheless convicted of the offense. The plurality elaborates, *ante*, at 49–50, on reasons *why* Montana might wish to preclude exculpation on the basis of voluntary intoxication, but these reasons—increased punishment and concomitant deterrence for those who commit unlawful acts while drunk, and implementation of society's moral perception that those who become drunk should bear the consequences—merely explain

the State's purpose in trying to improve its likelihood of winning convictions. The final justification proffered by the plurality on Montana's behalf is that Montana's rule perhaps prevents juries, who might otherwise be misled, from being "too quick to accept the claim that the [drunk] defendant was biologically incapable of forming the requisite *mens rea*," *ante*, at 50–51. But this proffered justification is inconsistent with § 45–2–203's exception for persons who are involuntarily intoxicated. That exception makes plain that Montana does *not* consider intoxication evidence misleading—but rather considers it relevant—for the determination of a person's capacity to form the requisite mental state.

A State's placement of a significant limitation on the right to defend against the State's accusations "requires that the competing interest be closely examined." *Chambers*, 410 U. S., at 295. Montana has specified that to prove guilt, the State must establish that the defendant acted purposely or knowingly, but has prohibited a category of defendants from effectively disputing guilt through presentation of evidence relevant to that essential element. And the evidence is indisputably relevant: The Montana Supreme Court held that evidence of intoxication is relevant to proof of mental state, 272 Mont., at 122–123, 900 P. 2d, at 265, and furthermore, § 45–2–203's exception for involuntary intoxication shows that the legislature does consider intoxication relevant to mental state. Montana has barred the defendant's use of a category of relevant, exculpatory evidence for the express purpose of improving the State's likelihood of winning a conviction against a certain type of defendant. The plurality's observation that all evidentiary rules that exclude exculpatory evidence reduce the State's burden to prove its case, *ante*, at 55, is beside the point. The *purpose* of the familiar evidentiary rules is not to alleviate the State's burden, but rather to vindicate some other goal or value—*e. g.*, to ensure the reliability and competency of evidence or to encourage effective communications within certain relationships.

Such rules may or may not help the prosecution, and when they do help, do so only incidentally. While due process does not "ba[r] States from making changes . . . that have the *effect* of making it easier for the prosecution to obtain convictions," *McMillan* v. *Pennsylvania,* 477 U. S., at 89, n. 5 (emphasis added), an evidentiary rule whose sole *purpose* is to boost the State's likelihood of conviction distorts the adversary process. Cf. *Washington,* 388 U. S., at 25 (Harlan, J., concurring in result). Unlike *Chambers* and *Washington,* where the State at least claimed that the evidence at issue was unreliable, Montana does not justify its rule on grounds such as that intoxication evidence is unreliable, cumulative, privileged, or irrelevant. The sole purpose for this disallowance is to keep from the jury's consideration a category of evidence that helps the defendant's case and weakens the government's case.

The plurality brushes aside this Court's precedents as variously fact bound, irrelevant, and dicta. I would afford more weight to principles enunciated in our case law than is accorded in the plurality's opinion today. It seems to me that a State may not first determine the elements of the crime it wishes to punish, and then thwart the accused's defense by categorically disallowing the very evidence that would prove him innocent.

## II

The plurality does, however, raise an important argument for the statute's validity: the disallowance, at common law, of consideration of voluntary intoxication where a defendant's state of mind is at issue. Because this disallowance was permitted at common law, the plurality argues, its disallowance by Montana cannot amount to a violation of a "fundamental principle of justice." *Ante,* at 43–51.

From 1551 until its shift in the 19th century, the common-law rule prevailed that a defendant could not use intoxication as an excuse or justification for an offense, or, it must be assumed, to rebut establishment of a requisite mental state.

"Early law was indifferent to the defence of drunkenness because the theory of criminal liability was then too crude and too undeveloped to admit of exceptions. . . . But with the refinement in the theory of criminal liability . . . a modification of the rigid old rule on the defence of drunkenness was to be expected." Singh, History of the Defense of Drunkenness in English Criminal Law, 49 L. Q. Rev. 528, 537 (1933) (footnote omitted). As the plurality concedes, that significant modification took place in the 19th century. Courts acknowledged the fundamental incompatibility of a particular mental-state requirement on the one hand, and the disallowance of consideration of evidence that might defeat establishment of that mental state on the other. In the slow progress typical of the common law, courts began to recognize that evidence of intoxication was properly admissible for the purpose of ascertaining whether a defendant had met the required mental-state element of the offense charged.

This recognition, courts believed, was consistent with the common-law rule that voluntary intoxication did not excuse commission of a crime; rather, an element of the crime, the requisite mental state, was not satisfied and therefore the crime had not been committed. As one influential mid-19th century case explained: "Drunkenness is no excuse for crime; yet, in that class of crimes and offences which depend upon guilty knowledge, or the coolness and deliberation with which they shall have been perpetrated, to constitute their commission . . . [drunkenness] should be submitted to the consideration of the Jury"; for, where the crime required a particular mental state, "it is proper to show any state or condition of the person that is adverse to the proper exercise of the mind" in order "[t]o rebut" the mental state or "to enable the Jury to judge rightly of the matter." *Pigman* v. *State*, 14 Ohio 555, 556–557 (1846); accord, *Cline* v. *State*, 43 Ohio St. 332, 334, 1 N. E. Rep. 22, 23 (1885) ("The rule is well settled that intoxication is not a justification or an excuse for crime. . . . But in many cases evidence of intoxication is

admissible with a view to the question whether a crime has been committed; . . . . As [mental state], in such case, is of the essence of the offense, it is possible that in proving intoxication you go far to prove that no offense was committed").

Courts across the country agreed that where a subjective mental state was an element of the crime to be proved, the defense must be permitted to show, by reference to intoxication, the absence of that element. One court commented that it seemed "incontrovertible and to be universally applicable" that "where the nature and essence of the crime are made by law to depend upon the peculiar state and condition of the criminal's mind at the time with reference to the act done, drunkenness may be a proper subject for the consideration of the jury, not to excuse or mitigate the offence but to show that it was not committed." *People* v. *Robinson*, 2 Park. Crim. 235, 306 (N. Y. Sup. Ct. 1855). See also *Swan* v. *State*, 23 Tenn. 136, 141–142 (1843); *State* v. *Donovan*, 61 Iowa 369, 370–371, 16 N. W. 206, 206–207 (1883); *Mooney* v. *State*, 33 Ala. 419, 420 (1859); *Aszman* v. *State*, 123 Ind. 347, 24 N. E. 123 (1890) (citing cases).

With similar reasoning, the Montana Supreme Court recognized the incompatibility of a jury instruction pursuant to § 45–2–203 in conjunction with the legislature's decision to require a mental state of "purposely" or "knowingly" for deliberate homicide. It held that intoxication is relevant to formation of the requisite mental state. Unless a defendant is proved beyond a reasonable doubt to have possessed the requisite mental state, he did not commit the offense. Elimination of a critical category of defense evidence precludes a defendant from effectively rebutting the mental-state element, while simultaneously shielding the State from the effort of proving the requisite mental state in the face of negating evidence. It was this effect on the adversarial process that persuaded the Montana Supreme Court that the disallowance was unconstitutional.

The Due Process Clause protects those "'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Patterson* v. *New York*, 432 U. S., at 202 (citations omitted). At the time the Fourteenth Amendment was ratified, the common-law rule on consideration of intoxication evidence was in flux. The plurality argues that rejection of the historical rule in the 19th century simply does not establish that the "'new common-law'" rule is a principle of procedure so "deeply rooted" as to be ranked "fundamental." *Ante*, at 46–48. But to determine whether a fundamental principle of justice has been violated here, we cannot consider only the historical disallowance of intoxication evidence, but must also consider the "fundamental principle" that a defendant has a right to a fair opportunity to put forward his defense, in adversarial testing where the State must prove the elements of the offense beyond a reasonable doubt. As concepts of *mens rea* and burden of proof developed, these principles came into conflict, as the shift in the common law in the 19th century reflects.

## III

JUSTICE GINSBURG concurs in the Court's judgment based on her determination that §45–2–203 amounts to a redefinition of the offense that renders evidence of voluntary intoxication irrelevant to proof of the requisite mental state. The concurrence emphasizes that States enjoy wide latitude in defining the elements of crimes and concludes that, "[c]omprehended as a measure redefining *mens rea*, §45–2–203 encounters no constitutional shoal." *Ante*, at 58.

A state legislature certainly possesses the authority to define the offenses it wishes to punish. If the Montana Legislature chose to redefine this offense so as to alter the requisite mental-state element, the due process problem presented in this case would not be at issue.

There is, however, no indication that such a "redefinition" occurred. JUSTICE GINSBURG's reading of Montana law is

plainly inconsistent with that given by the Montana Supreme Court, and therefore cannot provide a valid basis to uphold § 45–2–203's operation. "We are, of course, bound to accept the interpretation of [state] law by the highest court of the State." *Hortonville Joint School Dist. No. 1* v. *Hortonville Ed. Assn.*, 426 U. S. 482, 488 (1976); accord, *Groppi* v. *Wisconsin*, 400 U. S. 505, 507 (1971); *Kingsley Int'l Pictures Corp.* v. *Regents of Univ. of N. Y.*, 360 U. S. 684, 688 (1959). The Montana Supreme Court held that evidence of voluntary intoxication *was* relevant to the requisite mental state. 272 Mont., at 122, 900 P. 2d, at 265. And in summing up the court's holding, Justice Nelson's concurrence explains that while the legislature may enact the statutes it chooses, § 45–2–203 "effectively and impermissibly . . . lessens the burden of the State to prove beyond a reasonable doubt an essential element of the offense charged—the mental state element—by statutorily precluding the jury from considering the very evidence that might convince them that the State had not proven that element." *Id.*, at 128, 900 P. 2d, at 268. The Montana Supreme Court's decision cannot be read consistently with a "redefinition" of the offense.

Because the management of criminal justice is within the province of the States, *Patterson, supra,* at 201–202, this Court is properly reluctant to interfere in the States' authority in these matters. Nevertheless, the Court must invalidate those rules that violate the requirements of due process. The plurality acknowledges that a reduction of the State's burden through disallowance of exculpatory evidence is unconstitutional if it violates a principle of fairness. *Ante,* at 55. I believe that such a violation is present here. Montana's disallowance of consideration of voluntary-intoxication evidence removes too critical a category of relevant, exculpatory evidence from the adversarial process by prohibiting the defendant from making an essential argument and permitting the prosecution to benefit from its suppression. Montana's purpose is to increase the likelihood of conviction

of a certain class of defendants, who might otherwise be able to prove that they did not satisfy a requisite element of the offense. The historical fact that this disallowance once existed at common law is not sufficient to save the statute today. I would affirm the judgment of the Montana Supreme Court.

JUSTICE SOUTER, dissenting.

I have no doubt that a State may so define the mental element of an offense that evidence of a defendant's voluntary intoxication at the time of commission does not have exculpatory relevance and, to that extent, may be excluded without raising any issue of due process. I would have thought the statute at issue here (Mont. Code Ann. § 45–2–203 (1995)) had implicitly accomplished such a redefinition, but I read the opinion of the Supreme Court of Montana as indicating that it had no such effect, and I am bound by the state court's statement of its domestic law.

Even on the assumption that Montana's definitions of the purposeful and knowing culpable mental states were untouched by § 45–2–203, so that voluntary intoxication remains relevant to each, it is not a foregone conclusion that our cases preclude the State from declaring such intoxication evidence inadmissible. A State may typically exclude even relevant and exculpatory evidence if it presents a valid justification for doing so. There may (or may not) be a valid justification to support a State's decision to exclude, rather than render irrelevant, evidence of a defendant's voluntary intoxication. Montana has not endeavored, however, to advance an argument to that effect. Rather, the State has effectively restricted itself to advancing undoubtedly sound reasons for defining the mental state element so as to make voluntary intoxication generally irrelevant (though its own Supreme Court has apparently said the legislature failed to do that) and to demonstrating that evidence of voluntary intoxication was irrelevant at common law (a fact that goes

part way, but not all the way, to answering the due process objection). In short, I read the State Supreme Court opinion as barring one interpretation that would leave the statutory scheme constitutional, while the State's failure to offer a justification for excluding relevant evidence leaves us unable to discern whether there may be a valid reason to support the statute as the State Supreme Court appears to view it. I therefore respectfully dissent from the Court's judgment.

I

The plurality opinion convincingly demonstrates that when the Fourteenth Amendment's Due Process Clause was added to the Constitution in 1868, the common law as it then stood either rejected the notion that voluntary intoxication might be exculpatory, *ante*, at 43–45, or was at best in a state of flux on that issue. See also *ante*, at 68–71 (O'CONNOR, J., dissenting). That is enough to show that Montana's rule that evidence of voluntary intoxication is inadmissible on the issue of culpable mental state contravenes no principle " 'so rooted in the traditions and conscience of our people,' " as they stood in 1868, " 'as to be ranked as fundamental,' " *ante*, at 47 (quoting *Patterson* v. *New York*, 432 U. S. 197, 202 (1977)). But this is not the end of the due process enquiry. Justice Harlan's dissenting opinion in *Poe* v. *Ullman*, 367 U. S. 497, 542 (1961), teaches that the "tradition" to which we are tethered "is a living thing."[1] What the historical practice does not rule out as inconsistent with "the concept of ordered liberty," *Palko* v. *Connecticut*, 302 U. S. 319, 325

---

[1] "The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint." *Poe* v. *Ullman*, 367 U. S., at 542 (Harlan, J., dissenting).

(1937), must still pass muster as rational in today's world. Cf. *Medina* v. *California*, 505 U. S. 437, 454 (1992) (O'CONNOR, J., concurring in judgment) (although "historical pedigree can give a procedural practice a presumption of constitutionality . . . , the presumption must surely be rebuttable").

In this case, the second step of the due process enquiry leads to a line of precedent discussed in JUSTICE O'CONNOR's dissent, *ante*, at 61–68, involving the right to present a defense. See, *e. g.*, *Washington* v. *Texas*, 388 U. S. 14, 22 (1967) (a State cannot arbitrarily bar "whole categories of defense witnesses from testifying"); *id.*, at 25 (Harlan, J., concurring in result) (State may not "recogniz[e] [testimony as] relevant and competent [but] arbitrarily ba[r] its use by the defendant"); *Chambers* v. *Mississippi*, 410 U. S. 284, 294 (1973) (defendant entitled to a "fair opportunity to defend against the State's accusations"); *Crane* v. *Kentucky*, 476 U. S. 683, 690 (1986) (States may not exclude "competent, reliable evidence" that is "central to the defendant's claim of innocence" absent an adequate justification). Collectively, these cases stand for the proposition, as the Court put it in *Chambers*, *supra*, at 295, that while the right to present relevant evidence may be limited, the Constitution "requires that the competing interest [said to justify the limitation] be closely examined."

## II

Given the foregoing line of authority, Montana had at least one way to give effect to its judgment that defendants should not be permitted to use evidence of their voluntary intoxication to defeat proof of culpable mental state, and perhaps a second. First, it could have defined culpable mental state so as to give voluntary intoxication no exculpatory relevance. While the Due Process Clause requires the government to prove the existence of every element of the offense beyond a reasonable doubt, *In re Winship*, 397 U. S. 358, 364 (1970), within fairly broad limits the definition of those elements is up to the State. We thus noted in *Patterson* v. *New York*,

432 U. S., at 211, n. 12, that the various "due process guarantees are dependent upon the law as defined in the legislative branches," particularly on the legislature's enumeration of the elements of an offense, see *id.*, at 210 ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged"). See also *McMillan* v. *Pennsylvania*, 477 U. S. 79, 85 (1986) ("[I]n determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive"); *Martin* v. *Ohio*, 480 U. S. 228, 233 (1987) (same).

While I therefore find no apparent constitutional reason why Montana could not render evidence of voluntary intoxication excludable as irrelevant by redefining "knowledge" and "purpose," as they apply to the mental state element of its substantive offenses, or by making some other provision for mental state,[2] I do not believe that I am free to conclude that Montana has done so here. Our view of state law is limited by its interpretation in the State's highest court, see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 381 (1992); *Murdock* v. *Memphis*, 20 Wall. 590 (1875), and I am not able to square the State Supreme Court's opinion in this case with the position advanced by the State here (and supported by the United States as *amicus curiae*), that Montana's legislature changed the definition of culpable mental states when it enacted § 45–2–203. See 272 Mont. 114, 122, 900 P. 2d 260, 265 (1995) ("It is clear that such evidence [of intoxication] was relevant to the issue of whether Egelhoff acted knowingly and purposely"); *id.*, at 119–122, 900 P. 2d, at 263–265 (noting and not disputing Egelhoff's claim that § 45–2–203 removes from the jury's consideration facts relevant to a

---

[2] See *State* v. *Souza*, 72 Haw. 246, 249, 813 P. 2d 1384, 1386 (1991) ("The legislature was entitled to redefine the mens rea element of crimes and to exclude evidence of voluntary intoxication to negate state of mind").

determination of mental state, an essential element of the offense).

A second possible (although by no means certain) option may also be open. Even under a definition of the mental state element that would treat evidence of voluntary intoxication as relevant and exculpatory, the exclusion of such evidence is typically permissible so long as a State presents a "'valid' reason," *ante*, at 66 (O'CONNOR, J., dissenting), to justify keeping it out. *Chambers* and its line of precedent certainly recognize that such evidence may often properly be excluded. See *Chambers, supra*, at 295. As the plurality notes, *ante*, at 42, Federal Rules of Evidence 403 (addressing prejudice, confusion, misleading the jury, waste of time, etc.) and 802 (hearsay) provide two examples of an adequate reason for excluding relevant evidence.

Hence, I do not rule out the possibility of justifying exclusion of relevant intoxication evidence in a case like this. At the least, there may be reasons beyond those actually advanced by Montana that might have induced a State to reject its prior law freely admitting intoxication evidence going to mental state.

A State (though not necessarily Montana) might, for example, argue that admitting intoxication evidence on the issue of culpable mental state but not on a defense of incapacity (as to which it is widely assumed to be excludable as generally irrelevant[3]) would be irrational since both capacity to obey the law and purpose to accomplish a criminal result presuppose volitional ability. See Model Penal Code § 4.01 ("A person is not responsible for criminal conduct if at the time of

---

[3] See American Law Institute, Model Penal Code § 2.08(4) (1985), which deems intoxication relevant for this purpose only where by reason of "pathological intoxication" an "actor at the time of his conduct lacks substantial capacity . . . to conform his conduct to the requirements of law." The Model Penal Code further defines "pathological intoxication" as "intoxication grossly excessive in degree, given the amount of the intoxicant, to which the actor does not know he is susceptible." *Id.*, § 2.08(5)(c).

such conduct as a result of mental disease or defect he lacks substantial capacity . . . to conform his conduct to the requirements of law") and § 2.02(2)(a)(i) ("A person acts purposely with respect to a material element of an offense when . . . it is his conscious object to engage in conduct of that nature or to cause such a result"). And quite apart from any technical irrationality, a State might think that admitting the evidence in question on culpable mental state but not capacity (when each was a jury issue in a given case) would raise too high a risk of juror confusion. See Brief for State of Hawaii et al. as *Amici Curiae* 16 ("[U]se of [intoxication] evidence runs an unacceptable risk of potential manipulation by defendants and [will lead to] confusion of juries, who may not adequately appreciate that intoxication evidence is to be used for the question of mental state, not for purposes of showing an excuse"). While Thomas Reed Powell reportedly suggested that "learning to think like a lawyer is when you learn to think about one thing that is connected to another without thinking about the other thing it is connected to," Teachout, Sentimental Metaphors, 34 UCLA L. Rev. 537, 545 (1986), a State might argue that its law should be structured on the assumption that its jurors typically will not suffer from this facility.[4]

Quite apart from the fact that Montana has made no such arguments for justification here, however, I am not at all sure why such arguments would go any further than justify-

---

[4] Teachout notes that Powell acknowledged that this concept was not explicitly described in his essay entitled A Comment on Professor Sabine's "Pragmatic Approach to Politics," 81 Pol. Sci. Q. 52, 59 (1966), but in a letter wrote:

"If you think you can think about a
thing that is hitched to other
things without thinking about the
things that it is hitched to, then
you have a legal mind."

Quoted in Teachout, Sentimental Metaphors, 34 UCLA L. Rev., at 545, n. 17.

ing redefinition of mental states (the first option above). I do not understand why they would justify the State in cutting the conceptual corner[5] by leaving the definitions of culpable mental states untouched but excluding evidence relevant to this proof. Absent a convincing argument for cutting that corner, *Chambers* and the like constrain us to hold the current Montana statute unconstitutional. I therefore respectfully dissent.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

I join JUSTICE O'CONNOR's dissent. As the dissent says, and as JUSTICE SOUTER agrees, the Montana Supreme Court did not understand Montana's statute to have redefined the mental element of deliberate homicide. In my view, however, this circumstance is not simply happenstance or a technical matter that deprives us of the power to uphold that statute. To have read the statute differently—to treat it as if it had redefined the mental element—would produce anomalous results. A statute that makes voluntary intoxication the legal equivalent of purpose or knowledge *but only where external circumstances would establish purpose or knowledge in the absence of intoxication,* see *ante,* at 58 (GINSBURG, J., concurring), is a statute that turns guilt or innocence not upon state of mind, but upon irrelevant external circumstances. An intoxicated driver stopped at an intersection who unknowingly accelerated into a pedestrian would likely be found guilty, for a jury unaware of intoxication would likely infer knowledge or purpose. An identically intoxicated driver racing along a highway who unknowingly sideswiped another car would likely be found innocent, for a jury unaware of intoxication would likely infer negligence. Why would a legislature want to write a statute that

---

[5] Cf. *Rock Island, A. & L. R. Co.* v. *United States,* 254 U. S. 141, 143 (1920) ("Men must turn square corners when they deal with the Government").

draws such a distinction, upon which a sentence of life imprisonment, or death, may turn? If the legislature wanted to equate voluntary intoxication, knowledge, and purpose, why would it not write a statute that plainly says so, instead of doing so in a roundabout manner that would affect, in dramatically different ways, those whose minds, deeds, and consequences seem identical? I would reserve the question of whether or not such a hypothetical statute might exceed constitutional limits. Cf. *McMillan* v. *Pennsylvania*, 477 U. S. 79, 85–86 (1986); *Patterson* v. *New York*, 432 U. S. 197, 210 (1977); *Mullaney* v. *Wilbur*, 421 U. S. 684, 698–699 (1975).