Guadalupe A. SANCHEZ, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 92A03–9908–CR–322.

Court of Appeals of Indiana.

June 5, 2000.

Transfer Granted Sept. 5, 2000.

Susan K. Carpenter, Public Defender of Indiana, Gregory L. Lewis, Deputy Public Defender, Indianapolis, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Barbara Gasper Hines, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

VAIDIK, Judge

Appellant, Guadalupe A. Sanchez, appeals his convictions for Rape,[1] a Class A felony, and Confinement,[2] a Class B felony. Specifically, he contends that the trial court instruction, informing the jury that it could not consider evidence of his voluntary intoxication, violates the Due Course of Law provision of the Indiana Constitution. In 1996, the United States Supreme Court held that states could prevent defendants from presenting evidence of voluntary intoxication to show that they did not have the requisite intent to commit the charged offense. Sanchez acknowledges this holding but argues that the right is preserved under the Indiana Constitution and in particular, the Due Course of Law provision. Our review of the history at the time of the 1851 convention does not reveal that the drafters intended to guarantee a defendant the right to present evidence of intoxication under the Indiana Constitution. Additionally, subsequent case law, analyzing claims under the Due Course of Law provision, have utilized federal due process analysis. Therefore, we disagree that Sanchez is entitled to present evidence of intoxication under the Due Course of Law provision. Moreover, we conclude that even if our constitution does preserve such a right, because Sanchez was not entitled to an instruction on voluntary intoxication, no error can arise from the instruction given. We affirm.

### Facts and Procedural History

On July 6, 1998, seventeen-year-old H.S. went to the birthday party of Caesar Montezuma at a trailer situated on a horse farm. Sanchez was a guest at the party that began around 9:30 p.m. During the evening, Sanchez drank alcoholic beverages. After a while, the guests, including Sanchez, began dancing. While dancing with some of the female guests, Sanchez began touching their buttocks and between their legs. As a result, Montezuma's girlfriend, Jessica Alvarez, asked Sanchez to leave the party.

Around 11:30 p.m., most of the guests left the party. H.S. remained behind with two of her friends. Shortly thereafter, Sanchez returned and knocked on the door of the trailer. Montezuma opened the door and saw Sanchez carrying a 25 caliber semi-automatic handgun. Although H.S., Jessica and another girl attempted to flee, they were summoned back to the trailer. Sanchez then questioned them concerning the whereabouts of another girl who had been at the party. Although they informed Sanchez she was not there, he continued to ask about her. Sanchez then instructed them to bring him all of the telephones in the trailer. Jessica complied with this instruction. Shortly thereafter, Sanchez became convinced that the young woman he was looking for was not at the trailer. Consequently, he grabbed H.S. and forced her at gunpoint to leave with him. He then informed the others that if they moved, he would kill them.

Sanchez led H.S. to a cornfield where he ordered her at gunpoint to take off her clothes. The defendant then took off his clothes, except for his pants which were at his ankles. Still holding the gun, Sanchez ordered H.S. to lie on the ground where he

1. Ind.Code § 35–42–4–1.

2. Ind.Code § 35–42–3–3(1).

forced her to engage in sexual intercourse. Sanchez then performed oral sex on H.S. and kissed her. In disgust, H.S. spit which made Sanchez angry. He told her that if she spit again, he would kill her. Sanchez then lay on top of H.S. and began to have sexual intercourse with her again. Before he was finished, he instructed H.S. to get on her hands and knees and penetrated her from behind. Sanchez then ordered H.S. to straddle him and forced her to engage in sexual intercourse again.

Following the series of rapes, Sanchez allowed H.S. to get dressed. Once H.S. dressed and stood up, Sanchez began kissing her again. He then ordered her to lie on the ground, took off her clothes and engaged her in sexual intercourse again. Sanchez placed his penis in H.S.'s face and taunted her by asking, "You want, you want?" Record at 382.

At that point, H.S., believing that the police would be looking for them, suggested that Sanchez take her to his house. Sanchez agreed and led H.S. by foot to his home which was about three and half miles away. They followed a road for most of the way. Whenever a car approached, Sanchez would hide H.S. in the bushes or ditch. At one point, when they were close to Sanchez's house, H.S. attempted to escape by suggesting that they take different routes to the house. Sanchez refused.

Eventually they entered Sanchez's house. Sanchez took H.S. to the basement. Because H.S. was cold, she asked Sanchez for a blanket. While Sanchez was upstairs retrieving the blanket, H.S. heard him say to another occupant of the house, "I have a b—ch downstairs, Don't mess with us." Record at 390. When Sanchez returned with the blanket he again forced H.S. to engage in sexual intercourse. At one point during the night, both Sanchez and H.S. saw flashing lights and believed that the police had arrived. When this occurred, Sanchez responded, "Oh—it, [t]he f——ing cops," and instructed H.S. to tell the police that she was his girlfriend.

Record at 392. Shortly thereafter, Sanchez and H.S. fell asleep.

During the early morning hours, the police arrived and found Sanchez and H.S. asleep in the bed. The gun, which Sanchez had been carrying, was positioned on the bed near Sanchez's right hand. Sanchez's other hand was positioned under H.S.'s head and neck. Sanchez was placed under arrest and charged with rape and confinement.

A jury trial commenced on June 15, 1999. During the trial, the jury was instructed, over Sanchez's objection, that voluntary intoxication was not a defense to the charged offenses. The jury was further instructed that it was not permitted to consider Sanchez's intoxication in determining whether he acted knowingly or intentionally. Thereafter, the jury found Sanchez guilty as charged.

## Discussion and Decision

Sanchez challenges the trial court's instruction which prohibited the jury from considering evidence of voluntary intoxication. That instruction provided as follows: "Voluntary intoxication is not a defense to the charge of rape and confinement. You may not take voluntary intoxication into consideration in determining whether the defendant acted knowingly or intentionally as alleged in the information." Record at 766. According to Sanchez, the instruction improperly removed consideration of his voluntary intoxication from the jury in violation of the Due Course of Law provision of Article 1, Section 12 of the Indiana Constitution.

The instruction given by the trial court is based upon IND.CODE § 35-41-2-5, which went into effect in July 1997. That statute provides that "[i]ntoxication is not a defense in a prosecution for an offense and may not be taken into consideration in determining the existence of a mental state that is an element of the offense unless the defendant meets the requirements of IC 35-41-3-5." I.C. § 35-41-2-

5. Those requirements include becoming intoxicated without the person's consent or not knowing that the substance might cause intoxication. I.C. § 35–41–3–5(1)(2). Sanchez does not suggest that either exception applies. Rather, he argues that our constitution, and in particular, the Due Course of Law provision, guarantees a defendant the right to present evidence of voluntary intoxication.

In support of his argument, Sanchez relies on our supreme court's decision in *Terry v. State*, 465 N.E.2d 1085 (Ind.1984). There, the court concluded that the legislature could not prohibit a defendant from offering evidence of voluntary intoxication in his defense. At issue was a prior version of I.C. § 35–41–3–5, which provided that voluntary intoxication was a defense only to the extent it negated an element of an offense "referred to by the phrase 'with intent to' or 'with an intention to.'" *Id.* at 1087. Relying primarily on *Sills v. State*, 463 N.E.2d 228 (Ind.1984) and incorporating the rationale of that opinion, our supreme court concluded that the statute violated both the state and federal constitutions because it prevented the jury from considering a factor which tended to show whether the defendant possessed the requisite mens rea. *Id.* at 1088. The court explained its decision as follows:

> In order to form intent in any event the perpetrator must be acting consciously and competently. Any situation which renders the perpetrator incapable of forming intent frees him from the responsibility of his acts.... [I]f intoxication, whether it be voluntary or involuntary, renders that individual so completely *non compos mentis* that he has no ability to form intent, then under our constitution and under the firmly established principles of the *mens rea* required in criminal law, he cannot be held accountable for his ac-

tions, no matter how grave or how inconsequential they may be.

*Id.* (quoting *Sills*, 463 N.E.2d at 242) (emphasis in original) (citations omitted). The court further explained:

> Any factor which serves as a denial of the existence of *mens rea* must be considered by a trier of fact before a guilty finding is entered. Historically, facts such as age, mental condition, mistake or intoxication have been offered to negate the capacity to formulate intent. The attempt by the legislature to remove the factor of voluntary intoxication, except in limited situations, goes against this firmly ingrained principle.

*Id.* Finally, the court concluded by stating that "a defendant in Indiana can offer a defense of voluntary intoxication to any crime." *Id.*

In 1996, the United States Supreme Court held that a state could prohibit a criminal defendant from offering evidence of voluntary intoxication to negate the requisite mens rea without violating the Due Process Clause of the Fourteenth Amendment.[3] *Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). In that case, the defendant was charged with purposely or knowingly causing the death of another. During trial, the jury was instructed under Minnesota law that it could not consider the defendant's intoxicated condition in determining whether he acted with the requisite intent. *Id.* at 41, 116 S.Ct. 2013. In determining whether the statute violated the Due Process Clause, the Court initially noted that the right to introduce relevant evidence is not absolute and that a state is permitted to restrict certain evidence under its rules of evidence. *Id.* at 42–43, 116 S.Ct. 2013. The Court then set forth the following analysis to determine whether the statute violated the Due Process Clause:

> "Preventing and dealing with crime is much more the business of the States

---

**3.** The majority opinion was written by Justice Scalia with whom Chief Justice Rehnquist, Justice Kennedy and Justice Thomas con-

curred. Justice Ginsburg concurred in the judgment with separate opinion.

than it is of the Federal Government, and ... we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States. Among other things, it is normally 'within the power of the State to regulate procedures under which its laws are carried out,' ... and its decision in this regard is not subject to proscriptions under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' "

*Id.* at 43, 116 S.Ct. 2013 (quoting *Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)) (citations omitted). Accordingly, the Court stated that in order to find a violation of the Due Process Clause, the defendant was required to show that his right to present evidence of voluntary intoxication is a fundamental principle of justice. *Id.*

To make that determination the Court engaged in a historical analysis of the intoxication defense and found that although "by the end of the 19th century, in most American jurisdictions, intoxication could be considered in determining whether a defendant was capable of forming the specific intent necessary to commit the crime charged," at early common law, evidence of intoxication was emphatically disallowed. *Id.* at 46–47, 116 S.Ct. 2013. The Court concluded that because the intoxication defense had not gained "sufficiently uniform and permanent allegiance, to qualify as fundamental" the right to present evidence of intoxication was not protected under the Due Process Clause. *Id.* at 51, 56, 116 S.Ct. 2013.

Sanchez acknowledges the United States Supreme Court's holding and concedes, as has been noted by our supreme court, that *Terry* is no longer good law to the extent it found that prohibiting evidence of voluntary intoxication violates the Due Process Clause. *See State v. VanCleave,* 674 N.E.2d 1293, 1303 n. 15 (Ind.1996) (noting that "to the extent [*Terry* ] suggested IND.

CODE § 35–41–3–5(b) violates federal due process guarantees" *Terry* was no longer good law in light of *Montana v. Egelhoff* ), *reh'g denied, on reh'g in part,* 681 N.E.2d 181, *cert. denied,* — U.S. ——, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998); *Horan v. State,* 682 N.E.2d 502, 508 n. 5 (Ind.1997) (reiterating the comments from *VanCleave* but also noting that *VanCleave* did not further comment on "the precedential value of *Terry* in light of *Egelhoff* " and that therefore "that question remains open"), *reh'g denied. See also Bassie v. State,* 726 N.E.2d 242, 243 n. 1 (Ind.2000) (again recognizing that *Terry* had been overruled by *Egelhoff* with regard to federal due process claims but declining to further comment on the viability of *Terry* ). Accordingly, Sanchez raises his claim under the Indiana Constitution and in particular the Due Course of Law provision of Article 1, Section 12. Although *Terry* did not refer to a specific part of the Indiana Constitution, because Sanchez appears to be arguing that it should be based upon the Due Course of Law provision, we focus our analysis on that provision to determine whether it provides greater protection than its federal counterpart.

When interpreting a provision under the Indiana Constitution, we "search for the common understanding of both those who framed it and those who ratified it." *Collins v. Day,* 644 N.E.2d 72, 75 (Ind.1994). We examine the language of the provision in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution and the cases interpreting the provision. *Boehm v. Town of St. John,* 675 N.E.2d 318, 321 (Ind.1996). "The intent of the framers of the Constitution is paramount in determining the meaning of a provision." *Eakin v. State ex rel. Capital Imp. Bd. of Managers of Marion County,* 474 N.E.2d 62, 64 (Ind.1985). Thus, we examine the history of the times and the state of things when the constitution was framed and adopted. *Richardson v. State,* 717 N.E.2d 32, 38 (Ind.1999). The court's

goal is to ascertain "what the particular constitutional provision was designed to prevent." *Northern Ind. Bank and Trust Co. v. State Bd. of Finance of Ind.*, 457 N.E.2d 527, 529 (Ind.1983).

Initially, we note that we were unable to locate any meaningful discussions from the convention debates or journals regarding the Due Course of Law provision itself. We were able, however, to locate discussions concerning the common law from which the intoxication defense originated and public sentiment concerning intoxicating liquors. In order to understand the full impact of those discussions, we must first examine the history of the intoxication defense. We will then turn to the specific comments made with regard to the common law and the public sentiment concerning intoxicating liquors.

At early common law, intoxication was not a defense because it was considered a "gross vice" and a crime in itself. *Egelhoff*, 518 U.S. at 44–46, 116 S.Ct. 2013 (citation omitted). This viewpoint prevailed until the late 1800s. *Id.* at 47, 116 S.Ct. 2013. Although the emergence of the "new rule" allowing evidence of intoxication in specific intent crimes was first raised in an 1819 English case, that viewpoint was not embraced outright, with the majority of the states refusing to allow evidence of intoxication as a defense until the end of the 19th century. *Id.* at 46–47, 116 S.Ct. 2013.

Indiana followed the early development of the common law. *Carter v. State*, 408 N.E.2d 790, 797 (Ind.Ct.App.1980). It was not until 1860 that our supreme court first recognized that evidence of intoxication might be permitted for crimes involving "certain grades of homicide." *O'Herrin v. State*, 14 Ind. 420, 1860 WL 4131 (1860). That first pronouncement, however, was dicta in that the defense was not allowed because the defendant was appealing a conviction for larceny. *Id.* In 1890, our supreme court specifically recognized that evidence of intoxication was admissible in a homicide prosecution to reduce a conviction from first to second degree murder. *See Aszman v. State*, 123 Ind. 347, 24 N.E. 123, 126–27 (1890). Eventually, in 1901, our supreme court extended that ruling to allow evidence of intoxication in all specific intent crimes. *See Booher v. State*, 156 Ind. 435, 60 N.E. 156, 160 (1901). With this history in mind, we now turn to the discussions regarding the common law and intoxicating liquors made during the constitutional convention.

At the convention, a proposal was made to abolish the common law of England. Journal of the Convention of the People of the State of Indiana to Amend the Constitution 276 (1936) [hereinafter Convention Journal]. This proposal was not seriously considered, and therefore, did not pass. 1 Report of the Debates of the Convention for the Revision of the Constitution of the State of Indiana 722–24 (1851) [hereinafter Convention Debates]. Thus, the common law was preserved. One aspect of the common law, however, was changed – the requirement of indictment by a grand jury. Under the constitution of 1816, the use of the grand jury, which originated in England, was retained. Constitution Making in Indiana 251 (1916); 1 Convention Debates at 137. Under the 1851 constitution, the legislature was given the prerogative to abolish its use. Ind. Const. art. 7, § 17. During the debates on the abolishment of the grand jury, it was noted:

> I am aware that the Grand Jury is a secret and *ex parte* tribunal, and that its origin is English, and comes from an age of despotism; but it is equally true that but two governments in the world know anything of Grand Juries ... I refer to England and the United States. It is true, we long since separated ourselves from, and dissolved all connection with the British Crown; but it is equally true, that there are many valuable laws and institutions which we have derived from the mother country.

1 Convention Debates at 142. The proposal to abolish the common law and the

abolishment of the grand jury, as well as the comments made in relation thereto, are important for several reasons.

First, the comment recognizing the "many valuable laws and institutions" from England shows that the drafters were well acquainted with the common law of England and considered it sound with regard to many areas of the law. Thus, it is reasonable to assume that the drafters in 1851 were familiar with the early common law rule prohibiting use of intoxication as a defense. Second, the decision to abolish the grand jury shows that the drafters knew how to change parts of the common law with which they did not approve. Had they disapproved of the early common law rule prohibiting evidence of voluntary intoxication, a proposal to change that law could have been made. Finally, the refusal to abolish the common law in its entirety reveals the drafters' intent to preserve those parts of the common law as they existed at the time. In particular, by failing to abolish the common law rule with regard to voluntary intoxication, they preserved the majority rule at the time which was to disallow that evidence as a defense.

Public sentiment regarding intoxicating liquors at the time of the convention also aids this court in understanding the state of things existing at the time of the convention. Drunkenness was condemned as evidenced by the proposals and petitions made during the convention. For example, proposals to insert a clause in the constitution, prohibiting the legislature from "passing any law permitting license for the sale of spirituous liquors" were made. 2 CONVENTION DEBATES at 1434; CONVENTION JOURNAL at 193. The purpose of the proposals was to prevent the State from benefiting in any way from the sale of liquor. *See* 2 CONVENTION DEBATES at 1434 (desiring "that the State should not receive one farthing of the profits accruing from your accursed business"). The following comments were also made with regard to one of the proposals: "We say to the community at large, to the philanthro-

pist and the Christian, the field is clear, gird on your armor, harness yourselves for the contest; go forth, and if you can, with the great lever of public opinion, level to the ground every grog shop in the country." *Id.* Petitions to prohibit the traffic of alcoholic beverages were also presented by the citizens of Harrison and Jefferson Counties and the Indiana Conference of the Methodist Episcopal Church. CONVENTION JOURNAL at 123, 164, 322. In light of these petitions, comments and proposal, it is difficult to imagine that the drafters seriously considered preserving a defendant's right to present evidence of voluntary intoxication as a defense to a charged offense.

It is also important to note that our state provision was enacted before the federal provision. Our constitutional provision was enacted in 1851. The Fourteenth Amendment to the United States Constitution, which contains the Due Process Clause, was not ratified by the states until 1868. U.S. CONST. amend. XIV, § 1 (West's IND.CODE ANN.). Because the federal provision was not even in existence at the time our Due Course of Law provision was enacted, the drafters could not have intended to provide protection analogous to or greater than that provided under the Due Process Clause. Recently, our supreme court pointed out that the term "due process" does not even appear in the Indiana Constitution. *See Board of Zoning Appeals, Bloomington, Ind. v. Leisz,* 702 N.E.2d 1026, 1028 (Ind.1998). Thus, it is questionable whether the Due Course of Law provision should even be considered analogous to the Due Process Clause.

Nevertheless, numerous decisions following the enactment of the Due Course of Law provision have done so. *See Kizer v. Town of Winchester,* 141 Ind. 694, 40 N.E. 265, 267 (1895) (reviewing challenge to statute under Due Process Clause and Due Course of Law provision using single analysis); *Vandalia R. Co. v. Stilwell,* 181 Ind. 267, 104 N.E. 289, 290–91 (1914) (treating constitutional challenge under Employers'

Liability Act of 1911 similarly under Due Process Clause and Due Course of Law provision), *abrogated on other grounds*; *Wright v. House*, 188 Ind. 247, 121 N.E. 433, 437 (1919) ("The discussion of the 'due process of law' provision of the federal Constitution is applicable to [Article 1, Section 12] of the state Constitution."); *Mack v. State*, 203 Ind. 355, 180 N.E. 279, 283 (1932) (noting that the "[d]ue process of law, or 'due course of law' in the courts is guaranteed by section 12, art. 1, Indiana Constitution ... to 'every man, for injury done him in his person, property or reputation'"); *Dowd v. Harmon*, 229 Ind. 254, 96 N.E.2d 902, 905 (1951) (finding no violation of due process under "either the Constitution of Indiana or the Federal Constitution"); *State ex rel. Evansville City Coach Lines, Inc. v. Rawlings*, 229 Ind. 552, 99 N.E.2d 597, 604 (1951) (treating procedural due process claims under the Fourteenth Amendment and Article 1, Section 12 similarly); *Rader v. State*, 181 Ind.App. 546, 393 N.E.2d 199, 203 (1979) (using same analysis to address claims under Due Process Clause and Due Course of Law provision); *Scalf v. Berkel, Inc.*, 448 N.E.2d 1201, 1203 (Ind.Ct.App.1983) (finding that the Due Course of Law provision is a "constitutional provision analogous to the due process clause of the Fourteenth Amendment"); *Wilhoite v. Melvin Simon & Associates, Inc.*, 640 N.E.2d 382, 387 (Ind.Ct.App.1994) ("Indiana courts have construed the 'due course of law' protection of Article 1, Section 12 of the Indiana Constitution as analogous to the federal due process clause."); *Shook Heavy and Envtl. Constr. Group v. City of Kokomo*, 632 N.E.2d 355, 361 (Ind.1994) (analysis used under Due Process Clause of Fourteenth Amendment is applicable to Due Course of Law provision of Indiana Constitution); *Haimbaugh Landscaping, Inc. v. Jegen*, 653 N.E.2d 95, 104–05 (Ind. Ct.App.1995) (stating that the Indiana Due Course of Law provision of Article 1, Section 12 is analogous to Due Process Clause of Fourteenth Amendment), *reh'g denied, trans. denied*; *Indiana High Sch. Athletic Ass'n, Inc. v. Carlberg*, 694 N.E.2d 222, 241 (Ind.1997) (same analysis is applicable to claims brought under Due Process Clause of United States Constitution and Due Course of Law provision of Indiana Constitution), *reh'g denied*; *Reynolds v. State*, 698 N.E.2d 390, 392 (Ind.Ct.App. 1998) ("Both the Due Process Clause of the United States Constitution and the Due Course of Law provision of the Indiana Constitution prohibit state action which deprives an individual of life, liberty or property without due process."), *trans. denied*; *Martin v. Richey*, 711 N.E.2d 1273, 1283 n. 10 (Ind.1999) ("Indiana jurisprudence also includes another line of cases which focus on the phrase 'due course of law,' and have construed this phrase as affording procedural rights analogous to those afforded by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.").

Having noted the long line of cases treating the provisions similarly, we also recognize some cautionary language set forth by Justice Dickson in a dissenting opinion in *Carlberg*. In that case, Justice Dickson noted that although the court in *Shook* seemingly extended federal due process analysis to Article 1, Section 12 claims, the analysis should not necessarily be treated as coextensive with federal due process jurisprudence. *Carlberg*, 694 N.E.2d at 247. This statement was indeed prophetic, as most recently a plurality of our supreme court attempted to set forth the similarities and differences between the federal Due Process Clause and Article 1, Section 12 and seemingly rejected the long line of cases which had treated the two provisions similarly in all cases. *See McIntosh v. Melroe Co.* (2000), 729 N.E.2d 972, 974–975, 975–976. In particular, the plurality drew lines with regard to procedural and substantive claims brought in civil and criminal cases. With regard to criminal cases, the plurality seemed to indicate, in dicta, that procedural claims should be raised, not under Article 1, Section 12, but under other provisions of the

state constitution and that substantive due course of law claims would be "analogous to federal substantive due process." *McIntosh*, 729 N.E.2d at 976. Despite these broad pronouncements, the plurality still recognized, without approval or disapproval, that there have been numerous criminal claims raised under Article 1, Section 12 under the guise of "due process." *McIntosh*, 729 N.E.2d at 976 n. 2. Although it is not entirely clear what remains of due course of law claims raised in criminal cases, there still is no indication that Article 1, Section 12 or, in particular the Due Course of Law provision, provides greater protection or a different analysis than the federal Due Process Clause with regard to the claim Sanchez brings. Further, we are unable to find anything in our history at the time of the convention which suggests a different analysis should be applied under the Due Course of Law provision. Moreover, Sanchez does not suggest what that analysis might be.[4] Rather, he argues only for a different result because of other state constitutional provisions.[5]

■ Developing a constitutional argument under the Indiana Constitution requires an explanation as to how the state provision should be analyzed apart from the federal provision, not just that the result should be different. Absent argument or authority demonstrating a different analysis, this court will apply the federal analysis. *See Rynerson v. City of Franklin*, 669 N.E.2d 964, 966 n. 1 (Ind. 1996) (where defendant fails to provide argument or authority that analysis under Due Course of Law Provision is different than analysis used under Due Process Clause, issue will be analyzed under Due Process Clause).

■ Here, the analysis used by the United States Supreme Court to determine whether prohibiting evidence of voluntary intoxication violated the Due Process Clause is whether prohibiting the evidence offends a principle of justice so rooted in the traditions and conscience of our people so as to be ranked fundamental. Sanchez's duty on appeal, therefore, was not only to explain why the Due Course of Law provision requires a different *result* but to set forth a different *analysis*. As Sanchez has failed to do so, and we are not convinced that a separate analysis exists, we apply the analysis used by the *Egelhoff* court and conclude that precluding such evidence does not violate the Due Course of Law provision.

In light of the U.S. Supreme Court's analysis in *Egelhoff* and our state's reliance on the early common law, we are constrained to disagree with the *Terry* court statement that allowing evidence of intoxication is a "firmly ingrained principle." Further, as subsequent Indiana case law has applied federal due process jurisprudence to analyze Indiana Due Course of Law claims, we can conclude only that *Terry* is also no longer good law with regard to its holding under the Indiana Constitution in light of *Montana v. Egelhoff*, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). Thus, the current version of I.C. § 35–41–3–5 does not violate the Due Course of Law provision of the Indiana Constitution. As a result, the trial court did not err by instructing the jury that it could not consider evidence of Sanchez's intoxication in determining whether he acted with the requisite intent. While we recognize that there may well be

---

4. *See* Reply Brief at 3 ("[W]hile both federal and state analyses may be the same ... the result under the state constitution is different because the Indiana Constitution grants procedural rights different from those provided by the federal bill of rights.").

5. Specifically, Sanchez argues that the Due Course of Law provision, when read together with Article 1, Section 13, which guarantees a defendant the right to be heard by himself and counsel, Article 1, Section 19, which gives the jury the right to determine law and facts, and Article 1, Section 23, which prohibits the legislature from granting to any class of citizens privileges or immunities which do not equally belong to all citizens, guarantees a defendant the right to present evidence of voluntary intoxication.

sound reasons based in justice and fair play to permit evidence of voluntary intoxication, as set forth in our 1851 Constitution, the Due Course of Law provision does not preserve that right.

■ Finally, even if the state constitutional right to present evidence of voluntary intoxication is still viable under the Due Course of Law provision or otherwise, the trial court's decision to disallow the jury from considering evidence of voluntary intoxication is harmless error. In *Terry*, after concluding that evidence of voluntary intoxication could be offered as a defense to any crime, the court provided the following comments concerning the limitations of the intoxication defense:

> The potential of this defense should not be confused with the reality of the situation. It is difficult to envision a finding of not guilty by reason of intoxication when the acts committed require a significant degree of physical or intellectual skills. As a general proposition, a defendant should not be relieved of responsibility when he was able to devise a plan, operate equipment, instruct the behavior of others or carry out acts requiring physical skill.

*Terry*, 465 N.E.2d at 1088. Applying that proposition, the court concluded that although there was evidence that the defendant had been drinking, there was also evidence that he drove a car, directed other people and made decisions to follow a course of action. Thus, the court concluded that the trial court did not err by refusing the defendant's tendered instruction on voluntary intoxication "as no reasonable doubt existed that the appellant had the intent to commit the act for which he was charged." *Id.*

■ Thus, an adequate evidentiary basis for an intoxication instruction exists only if the evidence could create a reasonable doubt in the jury's mind that the accused had the intent to commit the charged offense. *Gibson v. State*, 516 N.E.2d 31, 32 (Ind.1987). The degree of intoxication is immaterial as long as the defendant was able to form the requisite intent. *Id.* at 33. Therefore, even if a defective instruction is given, if the evidence does not support an instruction on voluntary intoxication, there can be no error. *See Horan v. State*, 682 N.E.2d 502, 509 (Ind.1997) (finding that defendant was not entitled to instruction on voluntary intoxication where defendant devised plans, operated equipment, instructed others and carried out acts requiring physical skill, and therefore, giving defective instruction could not result in error), *reh'g denied*; *Babbs v. State*, 621 N.E.2d 326, 330 (Ind.Ct.App.1993) (concluding that there was no error in giving instruction where defendant was not entitled to instruction on voluntary intoxication as evidence revealed drinking did not impair defendant's ability to obtain rope, tie up victim, commit the robbery in a secluded area of the store, search for money, warn his accomplice when the police arrived and escape, and recall events at trial), *trans. denied*.

Here, the evidence of voluntary intoxication could not create a reasonable doubt in the jury's mind that Sanchez had the intent to commit the charged offense, despite the fact he may have consumed large amounts of alcohol. Sanchez was able to hold four people at gunpoint while inquiring as to the whereabouts of one of the girls who attended the party. Prior to taking H.S. hostage, he had the wherewithal to take both phones so no one could call for help. He led his victim to a secluded place, away from detection, to carry out the rapes. He had the physical ability to rape H.S. several times in different positions. After the rapes occurred, he was able to lead his victim out of the cornfield and to his home which was three and a half miles away. While walking, he avoided detection by hiding from approaching cars. Sanchez also had the capacity to know that H.S. was attempting to escape as they neared his house. Three to four hours after he abducted H.S., he still had the ability to rape H.S. again. When San-

chez thought that the police had detected him, he made statements which revealed that he knew what he was doing and was able to devise a story to avoid arrest. Finally, before they fell asleep, he had the foresight to place the gun near his right hand and his left hand under the victim's head to prevent her from escaping. Under these circumstances, there is no doubt that the alcohol did not impair Sanchez's ability to think and function, regardless of Sanchez's state of consciousness following his arrest. As Sanchez was not entitled to a jury instruction on voluntary intoxication, any instruction given could not have amounted to error.

Judgment affirmed.

DARDEN, J., and FRIEDLANDER, J., concur.