# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1344

_____

Tremayne L. Guinn,                        *
                                          *
            Appellant,                    *
                                          *   Appeal from the United States
      v.                                  *   District Court for the
                                          *   Western District of Missouri.
Michael Kemna,                            *
                                          *
            Appellee.                     *

_____

Submitted: March 14, 2007
Filed: June 7, 2007

_____

Before RILEY, BOWMAN, and ARNOLD, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Tremayne Guinn appeals from the order of the District Court[1] denying his petition for a writ of habeas corpus, 28 U.S.C. § 2254. We affirm.

After a jury trial in Missouri state court, Guinn was convicted of first-degree robbery, first-degree assault, and armed criminal action. The convictions were affirmed on appeal, State v. Guinn, 58 S.W.3d 538 (Mo. Ct. App. 2001) (9–2 decision), and his motion filed in state court for postconviction relief was

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

unsuccessful, Guinn v. State, 141 S.W.3d 94 (Mo. Ct. App. 2004) (per curiam). The evidence at trial was that Lori Clanin was returning to her apartment at 3434 Gillham in Kansas City, Missouri, at 5:20 a.m. on September 11, 1998. She was taking groceries from her car when she was approached by two men, one of whom stood very close to her and held a small pistol to her chest. After he took her purse from the car, Clanin thought he was about to shoot her, and she pushed the gun down. The man took a step back, the gun fired, and Clanin was hit and injured.

Clanin and a police detective used a computer program to create a composite sketch of her assailant that was published in *The Kansas City Star* and *The Kansas City Call*. Based on responses to those publications, the detective created a photographic lineup of possible suspects, but Clanin was unable to identify her assailant from among those photographs. Then the manager of an apartment building on Gillham near Clanin's building saw the composite sketch and contacted authorities. She thought the sketch resembled a man she had seen visiting apartment 2-E in the building she managed, and she was able to identify a photograph of Guinn as that person. Guinn's photograph was included in another array presented to Clanin, and she identified him as the man who robbed and shot her. Meanwhile, Clanin's stolen purse was found in the bathtub of an unoccupied apartment near 2-E.

In his § 2254 petition for a writ of habeas corpus, Guinn raised four issues. The District Court found no merit to any of them, denied the petition, and denied Guinn a certificate of appealability (COA). Guinn filed an application for a COA with this Court, which we granted as to two evidentiary issues. We review de novo the District Court's decision to deny relief on these issues, applying the standards of review set forth in the habeas statute. That is, under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Guinn is not entitled to habeas relief unless he can show that the state-court adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable

determination of the facts." 28 U.S.C. § 2254(d). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003).

For his first issue, Guinn claims a violation of his constitutional rights in the state trial court's failure to allow four witnesses to testify to hearsay statements made by Cornelius Johnson, a friend of Guinn's and a tenant of apartment 2-E. (In parts of the record, Johnson and Guinn are referred to as roommates, but the building manager testified that Guinn was not on the lease.) Guinn contends that Johnson told four of Guinn's relatives that he, Johnson, shot Clanin and that these four witnesses should have been permitted to testify to Johnson's statements against interest.

Our first task is to determine the appropriate clearly established federal law. Guinn proposes that the Missouri Court of Appeals and the District Court correctly identified Chambers v. Mississippi, 410 U.S. 284 (1973), as setting out the clearly established law applicable to his case. But Kemna contends that "Chambers is not clearly established federal law." Br. of Appellee at 11. He relies on the Chambers Court's statement that in reaching its conclusion that the habeas petitioner in that case was denied a fair trial, the Court established "no new principles of constitutional law." Chambers, 410 U.S. at 302. Kemna misses the point. The comment was related to the fact-intensive nature of the case. See id. at 303. While perhaps not a seminal case in the areas of the law applied to the issues raised, Chambers nevertheless articulates the legal principles applicable to Guinn's claims of constitutional error.

In a later-decided plurality opinion, the Supreme Court described the Chambers holding: "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." Montana v. Egelhoff, 518 U.S. 37, 53 (1996). Kemna contends that the four dissenting justices in Egelhoff "categorically stated the opposite view" from that of the four-justice plurality, Br. of Appellee at 14, when they described

Chambers "as a prohibition on enforcement of state evidentiary rules that lead, *without sufficient justification*, to the establishment of guilt by suppression of evidence supporting the defendant's case," Egelhoff, 518 U.S. at 62–63 (O'Connor, J., dissenting) (emphasis added). According to Kemna, because neither of these views of the Chambers decision commanded a majority in Egelhoff, no law was clearly established by the Chambers Court. Kemna asserts that "Guinn's claim, stripped of its *Chambers* rhetoric, boils down to whether the state court erred in excluding Johnson's confessions," relying on an Eighth Circuit case for the clearly established federal law. Br. of Appellee at 25. As we read it, the statement in the Egelhoff dissent to which Kemna refers does not reflect an "opposite view" at all. An "erroneous evidentiary ruling" can, of course, be one made "without sufficient justification." In any event, although the Chambers opinion established no new constitutional principle, it iterated and applied existing law to the facts of the case before the Court. We conclude that the Missouri Court of Appeals and the District Court correctly identified the applicable law in the Chambers line of cases, here stated yet another way: "[T]he Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote . . . ." Holmes v. South Carolina, 126 S. Ct. 1727, 1732 (2006) (unanimous decision) (describing arbitrary evidentiary rules discussed in previous Supreme Court opinions, including Chambers).

Guinn argues that the facts of his case are sufficiently analogous to those in Chambers that the decision of the state court denying his claim of constitutional error was contrary to this Supreme Court precedent. We disagree. We conclude that the facts of Guinn's case are not "materially indistinguishable" from Chambers, so the state court's decision in his case cannot be contrary to clearly established federal law. Williams v. Taylor, 529 U.S. 362, 405 (2000). And to the extent Guinn argues that the Missouri Court of Appeals unreasonably applied the law set forth in Chambers to his claims, he is likewise mistaken.

At Guinn's trial in March 1999, he made a proffer of the hearsay testimony at issue. First, Charleen Robinson, Guinn's mother, said, "I've been knowing Cornelius Johnson ever since five years ago" because "[h]im and Tremayne became best of friends at the age of nine until now." Trial Tr. at 361. She offered testimony that she was visiting Johnson and Guinn's apartment within a month or two after the robbery and assault of Clanin when Johnson told her "that he didn't really shoot the woman, the woman grabbed his hand and really shot herself." Id. at 363. But "[f]irst he said he shot the bitch." Id. She also recounted that Johnson "said that he pulled the gun to rob her." Id.

Guinn's eleven-year-old sister, Laguisha Robinson, would have testified that nearly four months after the shooting, she was present when her younger brother, Marvance Robinson, asked Johnson, "Who shot that lady?" Id. at 365. Laguisha continued, "And then he said, 'I did.' And I said, 'Why?' and he said, 'Don't worry about it.'" Id. at 365. Marvance—Laguisha and Guinn's nine-year-old brother—offered essentially the same testimony as his sister. There was no proffered testimony about who "that lady" was or when this shooting took place. The children said they knew Johnson because he was their brother's friend, but they did not say how well they knew him or for how long.

Finally, Guinn's nineteen-year-old cousin, Tosheda Myrick, would have testified that at some unspecified time after the shooting—she could not say when—she was living in an apartment with Guinn, Johnson, and Johnson's mother and brother when Johnson told her, in the presence of others (including Charleen Robinson), "that he robbed a lady and said he wasn't trying to shoot her but she wouldn't trying [sic] to give her valuables, so he said he just shot her." Id. at 370. She did not say how and when she came to know Johnson or how close she was to him.

The relevant facts of Chambers are quite different. In that case, officers were trying to arrest a suspect when he resisted, "and a hostile crowd of some 50 or 60

persons gathered." 410 U.S. at 285. Police officer Aaron Liberty was shot, and Liberty in turn shot and wounded Chambers as he ran from the scene. Chambers was later arrested and charged with Liberty's murder. Some months later, Gable McDonald, apparently at the urging of a third party, went to Chambers's attorneys and gave a sworn confession to killing Liberty. He was taken into custody. A month later, McDonald repudiated his confession at a preliminary hearing. He was released from custody with no further investigation into his possible involvement in Liberty's murder.

At Chambers's trial, he was not permitted to cross-examine McDonald as an adverse witness because a state common-law evidentiary rule prohibited a party from impeaching his own witness. Likewise, Chambers was not permitted to question under oath three other witnesses about inculpating statements McDonald made to them. The first of these witnesses, Sam Hardin, a "lifelong friend of McDonald's," was permitted to testify as an eyewitness that he actually saw McDonald shoot Liberty. Id. at 289. But Hardin also would have testified that McDonald confessed to him the very night of the shooting. Next, Berkley Turner was McDonald's friend and his claimed alibi for the time of the shooting. Turner testified, however, that he was not with McDonald when Liberty was shot. But Turner was not permitted to testify that while he and others were taking Chambers to the hospital after the melee, McDonald said he shot Liberty and that one week later, McDonald reminded Turner of the confession and "urged Turner not to 'mess him up.'" Id. at 292. Finally, Albert Carter was McDonald's neighbor and a friend for twenty-five years. Carter would have testified that the day after the shooting, McDonald told Carter that he shot Liberty and then disposed of the pistol. Carter also would have testified that he was with McDonald several weeks later when McDonald purchased a replacement pistol.

The Supreme Court determined that the failure to allow Chambers to cross-examine McDonald together with the erroneous exclusion of this proffered testimony deprived Chambers of a fair trial. The Court held that McDonald was indeed a

witness adverse to Chambers and that cross-examination should have been allowed. As for the three other witnesses, the Court concluded that their proffered testimony "bore persuasive assurances of trustworthiness" and should have been admitted under the hearsay exception for declarations against interest. Id. at 302. The Court cited several reasons for its conclusion. "First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred." Id. at 300. Also, each statement was corroborated by other evidence that was admitted at Chambers's trial: "McDonald's sworn confession, the testimony of an eyewitness to the shooting [Hardin], the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon." Id. Moreover, the "sheer number of independent confessions provided additional corroboration for each." Id. All three confessions were "self-incriminatory and unquestionably against interest." Id. at 301. And finally, McDonald was available to testify under oath.

Here, unlike in Chambers, none of the witnesses who heard Johnson's confessions were longtime or close friends, and none of the statements were made close in time to the assault. The confession the children heard was not spontaneous but responsive to a question Marvance asked. Moreover, there was precious little corroboration for the confessions. Guinn contends that discrepancies about facial hair and hairstyles and the fact that Clanin's purse was found in an unoccupied apartment near the one Johnson leased could provide the necessary corroboration. But the evidence about the assailant's appearance was contradictory,[2] and the location of

---

[2]Charleen Robinson would have testified that her son normally wore a mustache and a goatee and that Cornelius Johnson had no facial hair. Also, according to Robinson, Johnson wore his hair in braids and Guinn had a "short afro" at the time of Clanin's assault. Trial Tr. at 362. Clanin testified that the man who assaulted her had short braids, and she could not recall his facial hair. Guinn's counsel challenged Clanin's identification of Guinn on this basis in cross-examination and argued misidentification in her closing statement.

Clanin's stolen purse when recovered—near the apartment Johnson rented and Guinn frequented—incriminated Guinn as much as Johnson. Moreover, in contrast to the facts in Chambers, the only eyewitness to the crime to testify in this case identified the defendant (Guinn), not the third party (Johnson), as the perpetrator, and no witness put Johnson at the scene of the crime. Johnson, unlike McDonald, had not made a sworn confession. There were, as in Chambers, three confessions (two of Guinn's witnesses heard the same one), but they cannot be said to corroborate each other. Of the four proposed witnesses, only Charleen Robinson proffered testimony that described a version of the attack that might be readily reconciled with Clanin's sworn testimony. The confession made to Guinn's young siblings was vague as to the victim ("that lady"), and there was no indication at all as to when the shooting may have occurred and that it occurred in the course of a robbery. In addition, the statement Myrick heard does not fit with the account of the facts given by Clanin under oath or confessed by Johnson to Charleen Robinson. Clanin was shot after the assailant had taken her purse, not while she was resisting giving up her "valuables." And Johnson supposedly told Robinson that Clanin shot herself accidentally, not that he shot her because she would not give up her purse. These confessions, despite their "sheer number," id. at 300, hardly corroborate one another.[3] Finally, in this case Johnson was unavailable to be cross-examined under oath, to have "his demeanor and responses weighed by the jury." Id. at 301.

For these reasons, we cannot say that the state court's adjudication resulted in a decision that was contrary to or involved an unreasonable application of clearly

---

[3]Guinn argues that "there was corroborating evidence where the jury requested to see exhibits and for guidance from the judge while deliberating." Br. of Appellant at 23. According to Guinn, "If the jury were having a difficult time deciding Appellant's guilt without the benefit of his four witness' [sic] testimony, it is likely they would have had a much more difficult time of it with the testimony." Id. The jury's requests during deliberations are not evidence of any kind, much less evidence corroborating the confessions.

established federal law regarding the admission of hearsay statements against interest by a third party as a defense to a criminal charge.

We also granted a COA on Guinn's claim that his constitutional rights were violated when he was not permitted to cross-examine Detective James Herrington about Herrington's investigation—or lack thereof—of Johnson as a suspect in the robbery and assault of Clanin. According to Guinn, Herrington's responses on cross-examination "would have corroborated [Guinn's] proposed witnesses' testimony." Br. of Appellant at 25. As Guinn acknowledges, however, "there was no *admissible evidence* allowed by the trial court to support his claim herein that Johnson committed the crime." Id. at 27. He argues that his "due-process rights to confront his witnesses and to present testimony in his defense were clearly denied." Id.

The right of a criminal defendant to be confronted with the witnesses against him is found in the Sixth Amendment and is made applicable to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965). The Missouri Court of Appeals, citing a Missouri Supreme Court case quoting from the opinion in Kentucky v. Stincer, 482 U.S. 730, 739 (1987), noted that the Sixth Amendment right to cross-examine witnesses is not a right without limits. Guinn, 58 S.W.3d at 547. The appeals court then held that the trial court properly applied state law to disallow the cross-examination and that, in addition, the ruling was an appropriate exercise of the court's discretion to limit cross-examination.

The exclusion of "critical evidence" favorable to a criminal defendant does not necessarily deny him "a fair opportunity to defend against the State's accusations." Egelhoff, 518 U.S. at 53 (plurality opinion). In its opinion, the Missouri Court of Appeals noted that the right of confrontation through cross-examination, like the right of a criminal defendant to present evidence in his defense, can be limited in the discretion of the trial court judge. As the Supreme Court has explained, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine

a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). The Missouri Court of Appeals determined that while the cross-examination of Herrington might have led to relevant evidence, the trial court did not abuse its discretion by excluding the testimony. We hold that the adjudication by the state court, while not really addressing a constitutional issue, nevertheless did not result in a decision that was contrary to or involved an unreasonable application of clearly established federal law. See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (noting that a state-court decision being reviewed under AEDPA need not cite or even be aware of applicable Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them"). In the absence of any other evidence that Johnson may have been the perpetrator of the assault on Clanin, the proffered cross-examination of Herrington was, at best, marginally relevant to the case and would likely have confused the issues for the jury.

Guinn also raises the exclusion of the Herrington cross-examination as an adjunct to his first claim—had his relatives been permitted to testify as to Johnson's confessions, Guinn's proffered cross-examination of Herrington would have been admissible.

> In combination with the state court's ruling regarding exclusion of Appellant's proposed testimony with its prohibition on cross-examining Det. Harrington [sic] about the police's failure to adequately investigate Johnson, *Chambers* applies to require reversal because of the dramatic impingement on Appellant's due-process rights. Like *Chambers*, the facts and circumstances of this case deprived Appellant of a fair trial.

Br. of Appellant at 28. Indeed, the Chambers Court held that the erroneous exclusion of critical evidence, "coupled with" the erroneous refusal to allow the cross-

examination of McDonald, denied Chambers "a trial in accord with traditional and fundamental standards of due process." Chambers, 410 U.S. at 302. The Missouri Court of Appeals did not address a Chambers error-in-combination argument, however, probably because Guinn, while citing Chambers when he first challenged the exclusion of the hearsay testimony before trial, did not brief this precise argument to the appeals court, nor did he raise it in his pro se petition for a writ of habeas corpus to the District Court. The argument cannot be raised for the first time in this appeal from the denial of § 2254 relief. Even if we could consider the argument, the Supreme Court determined that the third-party hearsay confessions in Chambers were relevant and admissible and that the exclusion of McDonald's cross-examination violated Chambers's right to be confronted with the witnesses against him. We have held here that the state appeals court's determination that similar evidence was not improperly excluded at Guinn's trial did not result in a decision that was contrary to or involved an unreasonable application of clearly established federal law. That being the case, Guinn's error-in-combination argument would be unavailing.

Finally, in Guinn's brief, he argues on both COA issues that he has shown "by clear and convincing evidence" that the court's factual findings "should be set aside." Br. of Appellant at 22, 27–28. In discussing the issue relating to the exclusion of the hearsay testimony, he also makes the blanket statement that "the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Id. at 24. It is not clear to which specific factual findings Guinn refers. Guinn's invocation of the statutory language in a wrap-up paragraph does not meet his burden to rebut with clear and convincing evidence the presumption that the state court's findings are correct. See 28 U.S.C. § 2254(e)(1).

The order of the District Court denying the writ and dismissing the petition is affirmed.

_____

-11-