Filed 11/20/13  P. v. Lozano CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALFONSO DURAN LOZANO,<br><br>Defendant and Appellant. | B244012<br><br>(Los Angeles County<br>Super. Ct. No. BA384481) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Theresa A. Patterson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Alfonso Duran Lozano appeals his conviction, after a jury trial, of second degree murder and gross vehicular manslaughter while intoxicated. We affirm.

## BACKGROUND

An amended information filed August 21, 2012, charged Lozano with the murder of Michael Garcia in violation of Penal Code section 187, subdivision (a)[1] (count 1), and gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a) (count 2). Regarding count 2, the information alleged that Lozano had three prior convictions within the meaning of section 191.5, subdivision (d). Lozano pleaded not guilty and denied the allegations.

A jury found Lozano guilty on both counts. The court sentenced Lozano to 15 years to life on count 1, and 10 years on count 2, with the latter sentence stayed under section 654. No finding was made on the alleged prior convictions. Lozano was ordered to pay fines and fees as well as victim restitution, and received custody credits. He filed this timely appeal.

At trial, Trynett Walker, a supervisor for the Metropolitan Transit Authority, testified that at 4:00 a.m. on May 12, 2011 she was driving a white MTA vehicle eastbound on 6th Street in downtown Los Angeles, approaching the intersection with Hill Street. Sixth Street was one-way eastbound, and she was in the third lane from the left; the light on Hill Street was green. Walker looked to her right and noticed a SUV driving northbound on Hill Street at a high rate of speed without slowing down. Walker slowed down and was able to stop completely before fully entering the intersection; she still had the green light. The SUV continued going north, and a motorcycle on Walker's left side and driving at about the same speed continued into the intersection. The SUV hit the motorcycle, which struck a fire hydrant and then hit a pillar, going halfway up the pillar and exploding. Walker stayed in her vehicle and called for an ambulance.

Los Angeles Police Department (LAPD) Sergeant Guillermo Urrutia testified that he was on his way to work at 4:00 a.m. on May 12, 2011, also driving eastbound on 6th

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Street toward a green light on Hill Street behind a white MTA vehicle, with a motorcycle on his left side. The MTA vehicle in front of him stopped in the intersection. Sergeant Urrutia also slowed down and stopped. He saw a SUV going northbound on Hill Street run the red light and hit the motorcyclist, who was sent into a fire hydrant (which sheared off at the base) and then was pinned against a building. Sergeant Urrutia got out of the car, verified that the MTA vehicle driver was calling in the accident, and went over to the motorcyclist, who appeared dead. Sergeant Urrutia then approached the SUV. Both doors were locked, and an unconscious Lozano was in the passenger seat, lying against the passenger side door with his feet on the driver's side and across the center console. Both airbags had inflated, the windshield was damaged, and Lozano's forehead was bleeding. Sergeant Urrutia did not open the SUV doors. After paramedics arrived and took Lozano out of the SUV, Sergeant Urrutia noticed his ankles were deformed. The parties later stipulated that Lozano had broken both legs above the ankle.

LAPD Officer James Arredondo was a collision investigator who responded to the scene of the accident. The dead motorcyclist was identified as Michael Garcia. Officer Arredondo determined that the lights were working properly, and that the SUV was traveling northbound, failed to stop at the red light at 6th Street, and collided with the motorcycle. The SUV made no skid marks, which meant it did not brake to try to stop.

Another LAPD officer who searched the SUV found in the right front door pocket documents related to Lozano's previous convictions for driving under the influence and his participation in educational programs for convicted individuals, including a Department of Motor Vehicles letter revoking his license. The officer did not find or book any car keys.

LAPD Officer Pablo Palma testified that he went to the hospital to check on Lozano, and immediately noticed a strong odor of alcohol in the room. Lozano had bloodshot, watery eyes and his speech was slurred. Officer Palma placed Lozano under arrest for driving under the influence. Samples of Lozano's blood were taken at 7:15 a.m. and 8:28 a.m. A LAPD criminalist who analyzed the blood samples testified that they showed blood alcohol contents of .191 and .193 percent. A driver's skills would

3

be impaired at a blood alcohol level of .08 percent, and Lozano would have been impaired at the time of the accident, with a blood alcohol content of approximately .21 percent.

Katrina Ponce, a case manager at Northeast Valley Health Corporation, testified that Lozano had been her client and had twice participated in court-mandated rehabilitation programs for offenders convicted of driving under the influence. Ponce had met with Lozano about 30 times while he participated in programs that included an assessment, 26 group meetings, 26 face to face sessions, 26 self-help groups, and six education groups. The programs included information about the laws governing driving under the influence. Lozano had participated in a program showing videos of accidents resulting from driving under the influence and featuring a walk through the morgue to view dead bodies. The warning given in court to those convicted of driving under the influence included statements that being under the influence impairs the ability to drive safely, that it is dangerous to human life to drive while under the influence, and if an individual continued to drive under the influence and someone was killed as a result, the individual could be charged with murder.

Certified documents showed that Lozano had been convicted for driving under the influence in 2005 and 2007, and two times in 2010.

The defense presented no witnesses. Defense counsel argued to the court that the jurors needed a separate instruction that the prosecution must prove that Lozano was the driver of the SUV. The court denied the request, stating that it was clear from the existing instructions that the prosecution must prove beyond a reasonable doubt that Lozano committed an act that caused the death of Garcia, and if Lozano was merely a passenger then he did not commit an act causing Garcia's death.

In closing, defense counsel argued that the jury did not have to decide whether Lozano was under the influence or acted with implied malice: "Impairment, not an issue, don't even have to decide whether or not he was impaired. Now this one is a big one: implied malice, not an issue, don't have to decide that either, forcing you in this case [sic] that drinking and driving is dangerous. None of those are issues." The jury did not have

4

to worry about the instructions regarding murder or lesser offenses, because the prosecutor "had to prove to you that he was the driver, and this is where it gets interesting." There was no evidence that Lozano was the driver of the SUV. No witness testified that he or she saw Lozano driving. The circumstantial evidence was that Lozano was found alone in the car, but he was on the passenger side rather than in the driver's seat, and the prosecution presented no evidence to explain his position. The passenger airbag had deployed, and there was no evidence that it would have deployed if there was no passenger, and the exhibits showed the passenger seat reclined, maybe "because you had somebody riding in the passenger seat who was so drunk that they couldn't even sit up straight." Lozano had broken both legs, and the passenger side was more heavily damaged. The driver could have bolted from the car after the accident. Further, the missing ignition key supported a theory that the driver removed the key before fleeing. If the jury believed it was reasonable to conclude that Lozano was a passenger, they could not convict him. In rebuttal, the prosecution argued that the only reasonable conclusion was that Lozano was the driver.

## DISCUSSION

**I.     Former section 22, subdivision (b) does not violate Lozano's constitutional rights to due process and equal protection.**

Lozano argues at length that former section 22, subdivision (b) violated his constitutional rights to due process and equal protection. That section (now renumbered as section 29.4, subdivision (b)) provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." The jury was instructed, consistent with CALCRIM No. 625, that voluntary intoxication was not a defense to any

5

offense charged in this case. This was because the prosecution relied exclusively on a theory of implied malice[2] rather than express malice.

Former section 22 was amended in 1995 to preclude the use of evidence of voluntary intoxication to negate implied malice aforethought. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1114.) "The 1995 amendment to section 22 results from a legislative determination that, for reasons of public policy, evidence of voluntary intoxication to negate culpability shall be strictly limited. We find nothing in the enactment that deprives a defendant of the ability to present a defense or relieves the People of their burden to prove every element of the crime charged beyond a reasonable doubt, including, in this case, knowledge. [¶] Accordingly, we find no due process violation." (*Id.* at p. 1117.) The statute has survived both due process and equal protection challenges, and is "part of California's history of limiting the exculpatory effect of voluntary intoxication and other capacity evidence. [Citations.]" (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300–1302.) CALCRIM No. 625 is consistent with the statute, and "correctly states the law regarding voluntary intoxication." (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1381, italics omitted.) As the Fourth Appellate District recently explained at length, the constitutionality of former section 22, subdivision (b) is supported by *Montana v. Egelhoff* (1996) 518 U.S. 37 [116 S.Ct. 2013, 135 L.Ed.2d 361], and by the California appellate courts following that case to find that defendants' rights to due process and equal protection are not violated by not allowing voluntary intoxication to negate implied malice. (*People v. Carlson* (2011) 200 Cal.App.4th 695, 707–708.) We agree with the reasoning of those cases.[3]

---

[2] The jury was instructed it could find implied malice if it concluded that Lozano "intentionally committed an act," "the natural and probable consequences of the act were dangerous to human life," "at the time he acted, he knew this act was dangerous to human life," and "he deliberately acted with conscious disregard for human life."

[3] The defense theory at trial, as expressed in closing argument, was that the prosecution had not proved that Lozano was driving the SUV that struck and killed Garcia, so that implied malice was not an issue. Nevertheless, we do not agree with the respondent that because of this defense argument, even if there had there been error in the

## II. The jury was properly instructed on implied malice.

Lozano argues that the instructions on implied malice were contradictory and confusing, allowing him to be convicted based on a "reasonable person" standard rather than on a finding that he subjectively knew that his actions were dangerous to human life. Defense counsel did not challenge the instructions, but we may review instructions given without objection if Lozano's substantial rights were affected. (§ 1259.) The instructions were correct in law and did not affect Lozano's substantial rights.

The jury was instructed as follows regarding count 1, murder: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. [¶] Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with *express* malice if he unlawfully intended to kill. [¶] The defendant acted with *implied malice* if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. *A natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

---

instruction regarding implied malice, it would have been harmless. The prosecution's theory relied on implied malice, and the jury found Lozano guilty of murder.

7

These instructions are not contradictory or confusing.  They tell the jury that to find Lozano guilty of murder, they must find beyond a reasonable doubt that he committed an act that caused death, and that causation could be found if death was the "natural and probable consequence" of the act (that is, if a reasonable person would know death would likely happen).  The instructions also required the jury to find that Lozano subjectively knew at the time that he committed the act that it was dangerous to human life, and he deliberately acted with conscious disregard for human life.  The act (driving while under the influence) "caused" Garcia's death if a reasonable person would know death would likely result from driving while under the influence; but the jury also was told it must find that Lozano (not a hypothetical reasonable person) subjectively knew that driving while under the influence was dangerous to human life, and that Lozano deliberately acted, consciously disregarding that risk.  Under the instructions as given, the jury could separate the causation issue from the question of Lozano's subjective knowledge of the danger and his deliberate disregard of that danger.

No instructional error occurred.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.

We concur:


MALLANO, P. J.


ROTHSCHILD, J.

8